MOORE, Judge.
 

 Karen M. Taylor appeals from a judgment of the Morgan Circuit Court awarding her workers’ compensation benefits. We affirm in part and reverse in part.
 

 Facts and Procedural History
 

 On September 30, 2003, Taylor sued Goodyear Tire & Rubber Company, Inc. (“Goodyear”), seeking workers’ compensation benefits for an injury she had sustained that allegedly resulted from an accident arising out of and in the course of her employment with Goodyear. Taylor also asserted a claim of retaliatory discharge against Goodyear. Goodyear answered the complaint on October 31, 2003. After a trial, the trial court entered an order on December 14, 2007, stating:
 

 “This is a worker’s compensation case in which [Taylor] claims to have suffered compensable injuries to her right shoulder, cervical spine and low back while working for [Goodyear] on August 19, 2002. [Goodyear] does not deny that she injured her right shoulder as claimed, but denies that [Taylor’s] injuries to her cervical spine and low back were caused by an on-the-job accident. Having considered the parties’ stipulations, [Taylor’s] testimony, the voluminous medical records and the applicable law, the Court finds and concludes as follows:
 

 “Factual Findings
 

 “[Taylor and Goodyear] were subject to the Alabama Worker’s Compensation Statute at all times pertinent to the Court’s rulings in this case. The relationship of employer and employee existed between [Goodyear and Taylor] on August 19, 2002, the date of her alleged injuries. As of that date, [Taylor] had an average weekly wage of $1,156.16.
 

 ‘With regard to her right shoulder injury, [Goodyear] paid [Taylor] temporary total disability compensation over 18.71 weeks at $569.00 per week, temporary partial disability compensation for 176 days in the total sum of $9,020.58 and her medical expenses arising from that injury. While [Goodyear] has paid medical expenses of $2,948.34 arising from her alleged low back injury, it has paid no disability compensation relative to that claim.
 

 “While at work on August 19, 2002, [Taylor] experienced problems with a machine used in her splicing work. She pushed and lifted a portion of the machine described as a carousel when, according to [Taylor’s] trial testimony, she felt a pull in her right arm and the back of her right shoulder.
 

 “Right Shoulder Injury.
 

 “[Taylor] went to the Decatur General Hospital emergency department on August 21, 2002, where she complained of right shoulder and upper arm pain. The next day she reported her injury to [Goodyear], and a first report of injury was prepared which stated that she sustained a strain to her right shoulder. [Goodyear] referred her to Dr. Michael
 
 *816
 
 Lowery who diagnosed [Taylor’s] injury as a right shoulder strain. He referred her for physical therapy and placed her on restricted duty at work. [Taylor] continued to see Dr. Lowery for treatment of her right shoulder pain, as well as other complaints, through July, 2003. He maintained a diagnosis of chronic right shoulder pain. Around August 1, 2003, [Taylor] requested to be seen by an orthopedic surgeon because she felt that no satisfactory progress was being made in eliminating her right shoulder pain.
 

 “Dr. John Greco saw [Taylor] on August 8, 2003, for her shoulder injury. About a month later, he diagnosed a right shoulder impingement and recommended surgery. Dr. Greco on September 30, 2003, performed a right shoulder decompression and AC joint resection on [Taylor] and then referred her for postoperative] physical therapy. He placed her at maximum medical improvement as of November 24, 2003, with permanent partial physical impairment ratings of 5% to the upper right extremity and 3% to the body as a whole. Although he authorized her to return to work without restrictions, she did not do so.
 

 “Dr. Greco referred [Taylor] for a functional capacities evaluation which was performed by the Huntsville Hospital Return to Work program on January 6, 2004. After the evaluation, the following restrictions were recommended for [Taylor] floor to waist lift maximum of 25 pounds; waist to overhead lift maximum of 10 pounds; horizontal lift maximum of 25 pounds; static pushing ability maximum of 36 pounds of force; static pulling ability maximum of 60 pounds of force; right gripping ability maximum of 60 pounds PSI [per square inch]; left gripping ability maximum of 60 pounds PSI; front carrying ability maximum of 25 pounds; right hand carrying ability maximum of 20 pounds; left upper extremity carrying ability maximum of 25 pounds; and high abilities to work with arms above shoulder level, to work in the forward bent position while either sitting or standing, to perform rotational activities while either sitting or standing, to squat, to sit, to stand, to walk, to balance and to perform coordination activities with both the right and left upper extremities. It was felt that [Taylor] would have difficulty working in a static deep crouch position or crawling because of an old knee injury.
 

 “Dr. Greco agreed with the recommendations from the functional capacities evaluation. [Taylor] continued to consult him off and on through 2004 and 2005 with her complaints of right shoulder pain. He ordered additional diagnostic studies and gave her injections for tendinitis, but did not change his diagnosis or impairment ratings.
 

 “While serving in the military in 1991, [Taylor] had a right shoulder injury for which surgery was required. The Veterans Administration assigned a 10% impairment rating on account of that injury.
 

 “[Taylor] testified at trial that she continues to have problems with her right shoulder, as well as pain in her right arm and swelling in her right hand. She contends that she cannot raise her right arm above shoulder level, but believes that she can work within the temporary restrictions imposed by Dr. Lowery in January, 2003, before Dr. Greco did surgery, which included lifting no more than 15 pounds from floor to waist, lifting no more than 10 pounds from waist to overhead, working for limited periods of time at or above shoulder level, no crawling or stooping, pushing
 
 *817
 
 no more than 40 pounds, restricted bending and sitting occasionally.
 

 “It is the Court’s conclusion that [Taylor] suffered
 
 a scheduled injury to her right arm
 
 while working for [Goodyear] on August 19, 2002. Taking her continued pain and its other findings into consideration, the Court is reasonably satisfied that [Taylor] has sustained a 15% permanent partial impairment to her right arm.
 

 [[Image here]]
 

 “Cervical Spine Injury.
 

 “According to the emergency department records of Decatur General Hospital, when [Taylor] reported there on August 21, 2002, her neck and back appeared normal, were not tender and exhibited a painless range of motion. When she was examined by Dr. Lowery during a follow-up visit about a month later, he noted that [Taylor] had mild tenderness in the C4-7 area of her cervical spine. On his referral, she underwent an MRI on October 1, 2002, from which the radiologist made the following findings: mild bulges at C3-4 and C4-5 with no herniation or stenosis; minimal disc protrusion at C5-6 of undetermined clinical significance; and no areas of abnormal cervical cord signal. In his office notes of October 1 and December 4, 2002, Dr. Lowery mentioned that she had persistent neck pain with possible disk pathology and right cervical and shoulder pain. He sent her for conditioning and work hardening and when he saw her again on January 23, 2003, Dr. Lowery noted that [Taylor] had continued right cervical tightness.
 

 “[Taylor] went back to the Decatur General Hospital emergency department on March 16, 2003, with complaints of right shoulder, lateral neck and right leg pain. During a subsequent visit to the emergency department on April 23, 2003, her chief symptoms were right shoulder and arm pain, although the medical notes mention a cervical strain from lifting.
 

 “In April, 2004, Dr. Lowery ordered another MRI for [Taylor] which disclosed a slight bulge at C3-4 with no herniation and minimal encroachment upon the spinal canal. Insofar as the Court can determine from the medical charts admitted into evidence, neither Dr. Lowery nor any of the other physicians who examined and/or treated [Taylor] during 2003, 2004 and 2005 attributed any significance to the MRI findings, gave any opinion about whether or not she sustained an injury to her cervical spine on August 19, 2002, or assigned a permanent impairment arising from one or more bulging cervical discs.
 

 “The evidence before the Court is insufficient to establish a causal connection, either legally or medically, between the August 19, 2002, on-the-job lifting incident and any abnormal or bulging discs in [Taylor’s] cervical spine. While she may have experienced neck pain and stiffness, they just as likely could have resulted from her right shoulder injury as from a separate injury to her cervical spine. In any event, there is no substantial proof that the alleged cervical injury has caused a temporary total or permanent partial impairment for which [Taylor] is entitled to worker’s compensation benefits.
 

 “Low Back Injury.
 

 “As noted above, when [Taylor] went for emergency medical care two days after her on-the-job lifting injury, the records show that she complained only of right shoulder and arm pain. Examination of her back was normal. During her six visits to Dr. Lowery from August 22 through September 25, 2002, he made no note of a lower back injury or lower
 
 *818
 
 back pain. The first report of injury dated August 22, 2002, did not mention low back injury or pain.
 

 “Despite the foregoing notes and records, [Taylor] testified that when she reported her injury, she stated that she had pulled muscles from her neck to her lower back. A subsequent first report of injury dated February 5, 2003, stated that she injured her back and had back pain which she attributed to the incident that occurred on August 19, 2002. Dr. Lowery in his October 3, 2002 office note observed that [Taylor] now was complaining of pain in her lower back. He sent her to physical therapy in November, 2002. Toward the end of that month she reported that increased bending at work had worsened the pain in her low back.
 

 “After seeing [Taylor] in early December, 2002, Dr. Lowery commented that she reported low back pain with no history of a definite injury and that ‘this occurred after her current injury.’ This record apparently prompted [Taylor] to fill out another patient information sheet in his office in which she stated that she had experienced low back, buttock, hip and thigh pain since August 19, 2002. In February, 2003, Dr. Lowery ordered an MRI of her lumbar spine. It revealed that the lumbar vertebrae were normally formed and aligned and that there was a prominent facet arthropathy at L5-S1. After consulting with [Taylor] on April 24, 2003, Dr. Lowery made notes that he saw no relationship between her complaints of low back and leg pain and her initial report of right shoulder pain and diagnosed her as having chronic low back pain of undetermined causation that most likely was unrelated to her initial report of injury.
 

 “[Taylor] saw Dr. Philip Maddox for her lower back pain in April, 2003. He ordered another MRI which showed a slight bulging disc at L4-L5. Another orthopedic surgeon, Dr. Brian Carter, made a diagnosis of probable sacroiliac joint dysfunction. He agreed that she should continue with physical therapy and administered steroid injections into the sacroiliac joint in May and July, 2003.
 

 “In August, 2003, [Taylor] began seeing her family doctor, Dr. Brian Cost, for her low back pain. He referred her to Dr. Cyrus Ghavam, an orthopedic surgeon, who examined her and the most recent MRI. He opined that the MRI findings were normal, that she exhibited no neurologic deficits, that the facet arthrosis reflected on the MRI was appropriate to [Taylor’s] age and that surgery was not an option.
 

 “[Taylor] returned to Dr. Brian Carter in August, 2004, for further evaluation of low back and hip pain. He ordered a bone scan and stated in his August 6 notes that she had a soft tissue strain type injury that should have gotten better and that he was unable to document a specific cause of her continued pain. After reviewing the bone scan results, he found it to be essentially normal and confirmed his diagnosis of a sacroiliac joint strain. He administered another steroid injection to [Taylor’s] sacroiliac joint in early September, 2004, and then sent her for more physical therapy. On October 25, 2004, she requested that the remaining physical therapy be cancelled. At that time Dr. Carter made a final diagnosis of chronic sacroiliac joint pain, stated that he could not document any pathologic damage that was related to her initial injury and that could be causing the low back, hip and leg pain that she reported and placed her at [maximum medical improvement] with a 5% whole body impairment.
 

 
 *819
 
 “Having studied at length the medical evidence and having considered [Taylor’s] testimony, the Court does not question that she suffers from persistent low back, hip and leg pain. But the burden of proof is on her to prove that she suffered some injury on August 19, 2002, that is causing that pain. Dr. [Gregory] Millar[, a chiropractic physician,] is a compassionate man, but his opinions do not outweigh the opinions of Dr. Lowery and Dr. Carter. Both are of the opinion that whatever injuries [Taylor] suffered on August 19, 2002, are not related to her on-going low back pain. Without substantial and credible evidence of medical causation, [Taylor] cannot recover worker’s compensation benefits for her claimed low back problems.
 

 “Conclusions
 

 “1. [Taylor] suffered a compensable injury to her right shoulder as the result of an on-the-job injury that occurred on August 19, 2002.
 

 “2. [Goodyear] received prompt and adequate notice of [Taylor’s] injury to her right shoulder.
 

 “3. [Taylor] has been paid all of the temporary total disability compensation to which she is entitled for her right shoulder injury.
 

 “4.
 
 [Taylor] sustained an 15% permanent partial physical impairment from her right shoulder injury for which she is entitled to permanent partial disability compensation in the amount of $7,326.00 calculated as follows: 15% x 222 weeks x $220.00 per week.
 

 “5. [Taylor’s] claims that she suffered permanent compensable injuries to her cervical spine and lower back are not supported by the evidence and are not due to be compensated under the Alabama Worker’s Compensation Statute.”
 

 (Emphasis added.)
 

 On January 11, 2008, Taylor filed a notice of appeal with this court. This court dismissed the appeal by an unpublished order, stating:
 

 “[T]he trial court ... merely ordered separate trials for the retaliatory-discharge and workers’ compensation claims pursuant to Rule 42(b), Ala. R. Civ. P., and did not sever those claims pursuant to Rule 21, Ala. R. Civ. P. [Thus,] the trial court’s December 14, 2007, order does not fully adjudicate all the present controversies between the parties, leaving unresolved the claim for retaliatory discharge.”
 

 Taylor v. Goodyear Tire & Rubber Co.
 
 (No. 2070365, Dec. 4, 2008), 35 So.3d 18 (Ala.Civ.App.2008) (table). Thereafter, on January 9, 2009, the trial court entered an order certifying the December 14, 2007, order as a final judgment, pursuant to Rule 54(b), Ala. R. Civ. P. Taylor filed her notice of appeal on February 19, 2009.
 

 Standard of Review
 

 “Section 25-5-81(e), Ala.Code 1975, provides the standard of review in workers’ compensation cases:
 

 “‘(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
 

 “‘(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.’ “Substantial evidence is ‘ “evidence of
 

 such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d
 
 *820
 
 262, 268 (Ala.1996) (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)).
 

 “ ‘Our review is restricted to a determination of whether the trial court’s factual findings are supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this court to reverse the trial court’s judgment based on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence.
 
 See Ex parte M & D Mech. Contractors, Inc., 725
 
 So.2d 292 (Ala.1998). A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence.
 
 Edwards v. Jesse Stutts, Inc.,
 
 655 So.2d 1012 (Ala.Civ.App.1995).’
 

 “Landers v. Lowe’s Home Ctrs., Inc.,
 
 14 So.3d 144, 151 (Ala.Civ.App.2007).”
 

 G.A. West & Co. v. McGhee,
 
 [Ms. 2070961, July 17, 2009].
 
 *
 

 Discussion
 

 I.
 

 On appeal, Taylor first argues that the trial court erred by treating her shoulder injury as a scheduled injury to the arm instead of treating it as an injury to the body as a whole. Taylor notes that the trial court’s judgment correctly found “that Taylor had a right shoulder injury, that she was treated for the shoulder by Dr. Greco, and that [Dr. Greco] performed right shoulder surgery on Taylor.” Taylor points out that, despite those findings, the trial court erroneously concluded that Taylor had suffered a scheduled injury to her right arm. We agree.
 

 “In Ala.Code 1975, § 25-5-57(a)(3)a., workmen’s compensation benefits for permanent partial disability are based on an enumerated schedule which separately provides for the loss of certain body parts or members[, including the loss of an arm], Ala.Code 1975, § 25-5-57(a)(3)g., bases benefits in all other cases on the employee’s loss of earning ability.”
 

 E.C. Corp. v. Kent,
 
 618 So.2d 1357, 1357 (Ala.Civ.App.1992).
 

 This court has stated that “the shoulder is not part of the arm and where the injury is to the shoulder it is not proper to base the award on the proportionate loss to the use of the arm.”
 
 M.R. Thomason & Assocs. v. Jones,
 
 48 Ala.App. 67, 70, 261 So.2d 899, 902 (Ala.Civ.App.1972) (citing
 
 McCarty v. Campbell Plumbing Co.,
 
 45 Ala.App. 617, 619, 234 So.2d 895, 896 (Civ.App.1970));
 
 see also Werner Co. v. Williams,
 
 871 So.2d 845, 855 (Ala.Civ.App.2003) (stating that “an injury to the shoulder is not an injury to the arm”). In
 
 McCarty,
 
 a case analogous to the present case, this court stated that
 

 “the trial court entered a Finding of Fact and Decree concluding that [the employee] suffered a sternoclavicular separation on the right side and that [the employee] had suffered a 5% permanent partial disability of his right arm and assigned a recovery for permanent partial disability based upon an injury to the right arm.”
 

 
 *821
 
 45 Ala.App. at 619, 234 So.2d at 896. This court noted that “[t]he fact that the use of [the employee’s] arm was impaired by the injury does not of itself bring the injury within the category of a scheduled injury and thus warrant the basis of the award for partial loss of the use of the arm.” 45 Ala.App. at 620, 234 So.2d at 897.
 

 Similarly, in the present case, the trial court found that Taylor had suffered an injury to her right shoulder. Although Taylor’s shoulder injury impaired the use of her right arm, that “does not of itself bring the injury within the category of a scheduled injury and thus warrant the basis of the award for partial loss of the use of the arm.”
 
 Id.
 
 Accordingly, we conclude that the trial court erred in awarding permanent-partial-disability benefits based on a scheduled injury to Taylor’s right arm.
 

 In eases of permanent disability falling outside the schedule, the appropriate measure for compensation is the loss of earning capacity traceable to the injury.
 
 See Ex parte Rhea,
 
 807 So.2d 541, 545 (Ala.2001). Accordingly, we reverse the judgment and remand the case for the trial court to recalculate-the permanent-disability benefits due Taylor based on the loss of earning capacity, if any, Taylor incurred as a result of her shoulder injury.
 

 II.
 

 Taylor next argues that the trial court erred in finding that she had not suffered a compensable injury to her lower back, Taylor contends that she presented substantial evidence indicating that she injured her lower back while working on August 19, 2002. Indeed, Taylor submitted into evidence an “Associate Report of Accident” form that she filled out on which she noted that she was experiencing “pain on the right side from pulled muscles from neck to lower back” following the August 19, 2002, accident. Taylor also submitted the medical notes of Dr. Brian Carter in which Dr. Carter indicated that Taylor’s back injury was covered by workers’ compensation
 
 [1]
 
 and that the injury was probably a lifting, strain-type injury. Further, Taylor points to the testimony of Dr. Gregory Millar, who attributed Taylor’s back injury to her work-related accident.
 

 Nevertheless, the trial court had before it sufficient evidence to conclude that Taylor did not sustain an injury to her lower back as a result of the August 19, 2002, accident. Substantial evidence indicates that Taylor did not initially report an injury to her lower back but, rather, that she initially claimed that she had injured her back in the August 19, 2002, accident over a month later.
 
 See Davis v. Fabare Steel Supply, Inc.,
 
 469 So.2d 114 (Ala.Civ.App.1985) (testimony of orthopedic specialist that claimant did not complain about shoulder injury until over month after work-related accident that injured claimant’s fingers supported finding that shoulder condition was not occupational in nature). As noted in the trial court’s findings of fact, in December 2002 Dr. Michael Lowery recorded Taylor as attributing her back condition to no “definite injury and that ‘this occurred after her current injury.’ ” A statement made by an employee refuting any employment relation between a health condition and an occupational cause may be used by the trial court to support a finding that the condition is not work-related.
 
 See, e.g., Knapp v. Mitternight Boiler Works, Inc.,
 
 693 So.2d 506, 509-10 (Ala.Civ.App.1997)
 
 *822
 
 (statement of employee to two coworkers that he injured his back over the weekend picking up child supported finding that injury was not work-related);
 
 Van Winkle v. Muscle Shoals Mack Sales, Inc.,
 
 628 So.2d 905, 906 (Ala.Civ.App.1993) (employee’s statement to coworker attributing ankle injury to recreational accident supported finding that injury was not work-related). Finally, the trial court had before it evidence indicating that neither Dr. Lowery nor Dr. Carter believed that Taylor’s back condition was related to the August 19, 2002, accident. In cases involving conflicting expert testimony as to medical causation, the trial court has discretion as to the proper resolution of that dispute.
 
 See Crimson Indus., Inc. v. Eller,
 
 771 So.2d 1022, 1026 (Aa.Civ.App.1998).
 

 From Taylor’s perspective, the record indicates at best a dispute in the substantial evidence as to the cause of her back injury. However, on appeal, this court must view the evidence in a light most favorable to the trial court’s findings of fact.
 
 See Fort James Operating Co. v. Stephens,
 
 996 So.2d 833, 835 (Ala.2008). As explained above, when substantial evidence supports the factual findings of the trial court, this court may not reverse the trial court’s judgment because other substantial evidence supports a factual conclusion contrary to the findings made by the trial court.
 
 See Landers v. Lowe’s Home Ctrs., Inc., supra.
 
 Hence, we conclude that the trial court did not commit reversible error in finding that Taylor’s back injury is not work-related.
 

 III.
 

 For the same reason, we reject Taylor’s argument that the trial court erred in finding that she had not received a compensable injury to her cervical spine. Although Taylor points to substantial evidence in the record indicating that the August 19, 2002, accident caused her neck pain, the trial court had before it substantial evidence, which is cited at length in its findings of fact, to indicate otherwise.
 

 “The evidence contained in the record meets the definition of 'substantial evidence.’
 

 “ ‘If [substantial evidence supports the trial court’s findings of fact], then the judgment of the trial court must be affirmed. The appellate court is prohibited from reweighing the evidence, i.e., it is not to consider whether in its opinion the “substantial evidence” before the trial court might have caused the appellate court — if it had been the fact-finder — to find the facts to be different from what the trial court found them to be.’
 

 “Ex parte Staggs,
 
 825 So.2d 820, 822 (Ala.2001). We cannot substitute our judgment for that of the trial court.
 
 Ex parte Kmart Corp.,
 
 812 So.2d 1205 (Aa.2001). We may not reverse a judgment simply because we would have decided the facts differently than the trial court.
 
 Id.”
 

 Boise Cascade Corp. v. Jackson,
 
 997 So.2d 1042, 1047 (Ala.Civ.App.2008), Because Taylor has failed to persuade this court that the trial court erred in finding that her accident did not cause an injury to her neck, we cannot reverse the trial court’s judgment on this point.
 

 IV.
 

 Taylor finally argues that the trial court erred in determining the amount of temporary-total- and temporary-partial-disability benefits to which Taylor is entitled.
 

 “Temporary-total-disability benefits are payable to an employee who is unable to perform his or her trade or to obtain reasonably gainful employment during the healing period.
 
 Ex parte Moncrief,
 
 
 *823
 
 627 So.2d 385 (Ala.1993). Temporary-partial-disability benefits are payable to an employee who loses part of his or her earning capacity during the healing period.
 
 See Alabama By-Products Co. v. Landgraff,
 
 248 Ala. 253, 27 So.2d 215 (1946). The healing period is the period during which an employee is recovering from the injurious consequences of the work-related accident to the point the employee’s condition stabilizes, i.e., the date the employee reaches [maximum medical improvement].
 
 See G.UB.MK. Constructors v. Traffanstedt,
 
 726 So.2d 704, 709 (Ala.Civ.App.1998).”
 

 Wright v. Hatley Health Care, Inc.,
 
 980 So.2d 1024, 1030 (Ala.Civ.App.2007).
 

 At the trial, the parties stipulated that Taylor had injured her right shoulder on August 19, 2002, that Goodyear had paid Taylor temporary-total-disability benefits for 18.71 weeks, that Goodyear had thereafter paid Taylor 176 days of temporary-partial-disability benefits, and that Taylor had reached maximum medical improvement with regard to her shoulder injury on November 24, 2003. Taylor testified, however, that she had not received any workers’ compensation benefits since April 5, 2003. In Taylor’s brief to this court, she argues that she is entitled to additional temporary-disability benefits “to the extent that [those benefits have] not been paid.”
 

 We note that Dr. Lowery indicated that Taylor was able to return to work on March 27, 2003. Further, after Taylor’s functional-capacity evaluation in April 2003, Taylor was cleared to return to work. Taylor testified, however, that she did not immediately return to her job because she desired to get her back checked out first. Based on the foregoing substantial evidence, the trial court reasonably could have determined that Taylor had sufficiently healed from her shoulder injury in April 2003 to resume her job and that any subsequent reduction in pay was not due to the only condition attributable to her work-related accident, the shoulder injury.
 
 See Wright,
 
 980 So.2d at 1030 (“[T]he mere fact of unemployment does not make the employee eligible for temporary-disability benefits.... The key inquiry is whether that unemployment is due to the employee’s inability to earn because of the work-related injury.”). Thus, the trial court did not err in failing to award Taylor additional temporary-disability benefits.
 
 [2]
 

 Conclusion
 

 Based on the foregoing, we reverse the trial court’s judgment to the extent that it determined that Taylor’s right-shoulder injury was a scheduled injury, and we remand the cause for the trial court to recalculate the permanent-disability benefits to which Taylor is due. We affirm the judgment in all other respects.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 *
 

 Note from the reporter of decisions: On January 29, 2010, the Alabama Court of Civil Appeals withdrew the July 17, 2009, opinion in
 
 G.A. West & Co.
 
 and substituted another one. The quoted material is substantially the same in the substituted opinion. See
 
 G.A. West & Co. v. McGhee,
 
 [Ms. 2070961, January 29, 2010] - So.3d -, -(Ala.Civ.App.2009).
 

 [1]
 

 . Taylor notes that Goodyear’s workers’ compensation insurance carrier had authorized payment for a portion of the treatment Taylor received for her back injury. However; the furnishing of medical treatment is not admissible to prove liability for workers' compensation benefits.
 
 See Ex parte Sunbelt Transp., Inc.,
 
 23 So.3d 1138 (Ala.Civ.App.2009).
 

 [2]
 

 . Taylor also argues that she should be entitled to temporary-total-disability benefits from the date she reached maximum medical improvement on her shoulder until the date she reached maximum medical improvement on her back. Because we have already determined that the trial court properly found that Taylor’s back injury was not compensable,
 
 see
 
 section II, we decline to reverse the trial court's judgment on this point.