*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-AA-527

JACQUELINE DENT, PETITIONER,

v.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

PROVIDENCE HOSPITAL; SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.,
INTERVENORS.

Petition for Review of an Order of the
Compensation Review Board of the District of Columbia
Department of Employment Services
(CRB-101-13)

(Argued March 26, 2015                     Decided May 4, 2017)

(Amended May 25, 2017)[*]

*Michael J. Kitzman* for petitioner.

*Stacy L. Anderson*, Senior Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for respondent.

---

[*] This amended opinion reflects a correction in the subheader on p.3 and a minor clarification in fn.14.

*Sarah M. Burton* for intervenors.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] MCLEESE, *Associate Judge*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: This petition for review challenges the denial of Jacqueline Dent's claim for workers' compensation. Petitioner argues, *inter alia*, that the D.C. Department of Employment Services Compensation Review Board (CRB) erred in allowing the Administrative Law Judge (ALJ) to consider the absence of wage loss in deciding that she was not permanently partially disabled, and, therefore, denying her claim to a schedule award. Squarely addressing the question for the first time under the current version of the District of Columbia Workers' Compensation Act, we hold that the CRB reasonably concluded that wage loss (or the absence thereof) may be taken into account, along with other factors, in considering whether a claimant is entitled to a schedule award for permanent partial disability under the District of Columbia Workers' Compensation Act, D.C. Code § 32-1508 (3)(S) (2012 Repl.). Specifically, we hold that such evidence is a relevant consideration — though not necessary — in determining a claimant's disability percentage for a schedule award under D.C. Code § 32-1508 (3)(U-i). We therefore affirm the order of the CRB.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on March 18, 2017.

# I.    The Administrative Proceedings

## A.  Hearing by the Department of Employment Services, Office of Hearings & Adjudications

Petitioner testified that on May 8, 2001, she injured her right shoulder at work at Providence Hospital, intervenor in this case, when she fell off her chair and hit the desk.  The employer's health staff at Providence Hospital gave petitioner pain medication and referred her to physical therapy.  Ultimately, the health staff suggested that petitioner follow up with an orthopedic surgeon.  Petitioner was tested, diagnosed, and treated by three orthopedic surgeons:  Dr. Edward Rankin, Dr. Steven Hughes, and Dr. Easton Manderson.

At the time of the injury in 2001, petitioner was working two 40-hour jobs, at Providence Hospital and Howard University Hospital.[1]  She continued to hold both jobs until 2010, when she retired from Providence Hospital, but remained full time at Howard University Hospital, even working overtime, leading to 50- to 60-hour work weeks.  At the hearing on September 18, 2012, petitioner testified that

---

[1]    At Providence Hospital, petitioner worked as a receptionist/clerk, scheduling medical examinations for patients.  At Howard University Hospital, she was employed as a patient access associate "with duties consisting primarily of computer input."

she still experienced pain, explaining, "Yes, I am continually having problems with my shoulder and my neck. And I'm having numbness on my right arm, down into my fingers." Petitioner worked as a patient access associate at Howard and she needed to "hit[] the keyboard a little harder" due to the numbness in her right hand. At home, petitioner had difficulty vacuuming, caused by the pain in her neck and shoulder. She applied heat to her shoulder and neck about four days a week to relieve the pain. She testified that she continued to be treated by Dr. Manderson for problems with her right shoulder and that he prescribed physical therapy and Percocet to relieve her shoulder pain.

During cross-examination, petitioner described other injuries that she suffered while employed at Providence Hospital. In 1999, she injured her back; in 2010, she injured her lower back and left shoulder. After the 2010 injury, she continued to see Dr. Manderson for treatment of her lower back pain but did not complain to him about ongoing pain in her right shoulder.[2]

---

[2] In response to a question from intervenor's counsel about why petitioner did not complain to Dr. Manderson about her right shoulder in 2010 or 2011, petitioner testified, "I did not complain to Dr. Manderson because he was not the treating physician and I did not have authorization to go to him for my shoulder under the guidelines of Providence Hospital."

In addition to her testimony, petitioner submitted medical documentation in the form of reports by Dr. Hughes, Dr. Rankin, and Dr. Joel Fechter, and an MRI of her right shoulder. Dr. Hughes conducted an independent medical evaluation on July 5, 2001, and, based on petitioner's report that she had no prior injuries to her shoulder, opined that petitioner's neck and right shoulder symptoms were "causally related to the accident of [May 8, 2001]," subject to "subsequent medical records." Dr. Hughes then began treating petitioner and in a progress note dated August 8, 2001, recommended physical therapy for bursitis-tendinitis of the right shoulder and predicted that petitioner should be able to return to unrestricted duties within four to six weeks. On November 19, 2001, Dr. Rankin conducted a physical examination of petitioner, who complained of continuing pain in her neck that radiated down her right arm. After examining petitioner and reviewing an MRI of her right shoulder, Dr. Rankin diagnosed petitioner with "mild tendinosis of the distal supraspinatus as well [as] a small incomplete tear on the inferior surface. The MR[I] of the cervical spine showed some bulging at C5-6." He prescribed physical therapy and Vioxx 50(mg) and placed no restrictions on her work activity. Ten years after the work incident, Dr. Fechter took petitioner's medical history, reviewed x-rays, and conducted a physical examination of petitioner on February 11, 2011. He concluded that she had a twenty-three percent impairment of her upper right extremity: ten percent impairment under the American Medical

Association (AMA) guidelines, four percent impairment attributable to pain, and an additional nine percent impairment attributable to weakness (3%), loss of endurance (3%), and loss of function (3%).

Providence Hospital submitted records of the independent medical examinations of petitioner conducted by Dr. Hughes and Dr. Marc Danziger, and medical records from Dr. Manderson, the treating physician. Dr. Danziger conducted an independent medical evaluation of petitioner on June 14, 2011, and did not describe any lingering issues from petitioner's 2001 right shoulder injury. Dr. Hughes conducted an independent medical evaluation of petitioner on December 8, 2011, and a re-evaluation on July 25, 2012; both times he concluded that petitioner "would qualify for a permanent impairment to the right upper extremity of 5% with no apportionment based on available records and history."[3] Dr. Manderson conducted a series of evaluations from April 30, 2010, to March 25, 2011, and treated petitioner primarily for lower back pain, which resulted from a different workplace injury. In his reports, Dr. Manderson did not mention petitioner's right shoulder injury.

---

[3] Dr. Hughes conducted the first evaluation pursuant to the Fifth Edition of *The Guides of Evaluation of Permanent Impairment*, published by the American Medical Association; the second evaluation applied the Sixth Edition.

## B. ALJ Compensation Order[4]

Petitioner argued that she was entitled to a twenty-three percent rating for permanent partial disability to her right shoulder and right arm based on Dr. Fechter's assessment. The employer urged the ALJ to accept the opinion of Dr. Hughes, who found that petitioner has a 5% permanent partial disability in the upper right extremity. After considering the medical assessments and factors enumerated in D.C. Code § 32-1508 (3)(U-i)(i)-(v) for schedule awards, the ALJ made the following findings of fact:

> I find that [petitioner] was not a credible witness. I find that [petitioner] has reached maximum medical improvement from her May 8, 2001 work injury to her right shoulder. *[Petitioner] has a 5 per cent permanent partial physical impairment of her right upper extremity.* I find [petitioner] has no permanent partial disability of the right upper extremity based upon factors of pain, weakness, atrophy, loss of endurance and loss of function. I further find no reliable credible evidence [that petitioner's] May 8, 2001 work injury has altered her capacity to meet personal, social, or occupational demands. *I find [petitioner] has no permanent partial disability of the upper right extremity.*

---

[4] Providence Hospital made voluntary payments, based on Dr. Hughes's assessment of 5% permanent partial disability. Petitioner filed an Application for Formal Hearing, seeking a higher award.

AHD No. 12-381, Compensation Order at 3 (July 23, 2013) (emphasis added) [hereinafter AHD Order]. The ALJ noted that "[d]isability is an economic and not a medical concept and any injury that does not result in loss of wage-earning capacity cannot be the foundation for a finding of disability." *Id.* at 8. In conclusion, the ALJ rejected the claim

> due to the remoteness of her claim, the lack of evidence to support her testimony of ongoing symptoms related to the injury, lack of medical evidence to support testimony that she is currently receiving ongoing treatment related to the injury[,] the fact that there have been intervening injuries and treatment, and the fact that, with the exception of time off due to other injuries, [petitioner] has been able to and has continued to work.

*Id.* at 9. Petitioner appealed the ALJ's decision to the CRB.

### C. CRB Decision and Order

On appeal, the CRB considered four issues: whether the ALJ erred in considering whether there had been an actual wage loss when assessing petitioner's claim; whether the ALJ erred in considering the lack of ongoing medical treatment; whether the Compensation Order denying petitioner's claim was supported by substantial evidence; and whether the ALJ improperly accorded the treating

physician preference to Dr. Hughes's opinion.

The CRB concluded that the ALJ's determination that petitioner sustained no economic loss resulting from her injury was supported by substantial evidence and affirmed the Compensation Order denying any schedule award for permanent partial disability. The CRB noted that the ALJ found that petitioner has a physical impairment of 5% to her right upper arm, consistent with Dr. Hughes's medical assessment, but that considering the 10-year history of uninterrupted full-time employment since the injury, there was "no evidence that the impairment is likely to have any economic or industrial impact." The CRB rejected petitioner's argument that *Smith v. District of Columbia Dep't of Emp't Servs.*, 548 A.2d 95 (D.C. 1988), mandated a schedule award for permanent partial disability without regard to whether petitioner had suffered a wage loss. The CRB read the statement in *Smith* that "impaired earning capacity need not be proved to receive schedule benefits" as referring to the method by which benefits for permanent disability are calculated pursuant to a schedule award. The CRB explained that *Smith* discussed "the theoretical underpinnings of schedule awards and how once such an award is made, what actually happens in the future is irrelevant to whether a claimant has been over or undercompensated by the award that was made, because it is 'conclusively presumed' that the statutory schedule represents the industrial effect

of the injury." The CRB noted that "*Smith* does not say that a claimant's actual wage loss experience *prior* to receiving an award under the schedule is irrelevant to the making of the prediction regarding *future* wage loss." The CRB then cited (*Carolyn*) *Jones v. District of Columbia Dep't of Emp't Servs.*, 41 A.3d 1219 (D.C. 2012), for the proposition that the ALJ can consider the "existence and amount of a specific, identifiable loss of wages" in schedule award cases. The CRB concluded that "to the extent that such wage loss correlates with or is indicative of loss of wage-earning capacity or economic impairment, actual wage loss history (its presence or absence) may be considered as a factor by an ALJ in making a prediction about the future impact a schedule injury will cause." The CRB affirmed the ALJ's decision that petitioner had no compensable permanent partial disability, finding it was supported by substantial evidence and correct legal analysis. This petition for judicial review of the agency decision followed.

## II.

We review the CRB's Decision and Order which affirmed the ALJ's Compensation Order — we do not directly review the ALJ's determination on appeal. *See* (*Carolyn*) *Jones*, 41 A.3d at 1221. Judicial review of an administrative decision is limited to determining whether the decision is arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law. *See id.* "We will not affirm an administrative determination that 'reflects a misconception of the relevant law or a faulty application of the law.'" *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 1276, 1280 (D.C. 2010) (quoting *Georgetown Univ. v. District of Columbia Dep't of Emp't Servs.*, 971 A.2d 909, 915 (D.C. 2009)). "However, 'we acknowledge [the CRB's] expertise and . . . responsibility for administering the Workers' Compensation Act,' and thus 'we ordinarily must defer to [its] reasonable interpretations of ambiguous provisions in that legislation.'" *Asylum Co. v. District of Columbia Dep't of Emp't Servs.*, 10 A.3d 619, 625 (D.C. 2010) (alteration in original) (quoting *Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 960 A.2d 603, 606 (D.C. 2008)).

In her petition for review, petitioner alleges that the CRB erroneously affirmed the ALJ's order because the CRB required a schedule award claimant to prove impaired earning capacity to receive benefits and permitted the ALJ to consider the absence of wage loss in evaluating the evidence of economic impairment; erred in allowing the ALJ to consider the character and regularity of continuing medical care when assessing the disability percentage of a permanent injury; and erred in concluding that substantial evidence supported the ALJ's

finding that petitioner was not a credible witness.

## A. Schedule Awards for Permanent Partial Disability
## and Evidence of Wage Loss

The principal legal issue presented in this petition for review is whether wage loss (or the absence thereof) may properly be taken into consideration in deciding whether a claimant is entitled to a schedule award for a permanent partial disability based on loss of use.

Some states permit the introduction of such evidence in determining whether to compensate for loss of use of a scheduled member depending on the conceptual basis states employ for compensating disability under workers' compensation statutes: industrial use or physical use. In industrial use jurisdictions a worker's wages may be considered as a means of measuring an individual claimant's post-injury ability to engage in work. 7 LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 86.04[5] at 86-20, 24 (Matthew Bender, Rev. Ed. 2014).[5]

---

[5] *See, e.g.*, *Mid-Continent Cas. Co. v. Busick*, 353 S.W.2d 926, 928-29 (Tx. Civ. App. 1962) (holding that evidence showing worker was able to continue to work after injury and earn wages as before injury did not permit finding that

(continued . . .)

In physical use jurisdictions, loss of use, as "derivative from and equated to the concept of [physical] loss, . . . should be judged in purely functional terms, with no reference to the impact on the claimant's ability to perform his particular work." *Id.* at 86-22.[6] LARSON criticizes the purely physical approach in determining loss of use for worker's compensation:

> The trouble with these cases is that they assume that "loss of use" can be mechanically measured in relation to use by some theoretical claimant. They assume, in other words, that the concept of "loss of use" of the hand has some fixed uniform content as to all human beings, regardless of age, sex, skill, or anything else. But the very word "use" immediately raises the question: use for what? For assembling electronic equipment? For delivering a karate chop? For threading a needle? For holding a pencil? For lifting a bale of cotton? These are all "uses," after all.

*Id*. at 86-23.

---

(. . . continued)
"member [wa]s so affected as to substantially and materially impair the use thereof in the practical performance of its function in the pursuit of a laboring man").

[6] *See, e.g.*, *General Motors Corp. v. Sligh*, 133 S.E.2d 56, 57 (Ga. Ct. App. 1963) (reversing award to scheduled member based on consideration of employment because award should be "based on [physical] impairment to the member, irrespective of the earning ability of a claimant after an accident is sustained") ( internal quotation marks omitted).

The CRB's decision in this case implicitly recognized that the District of Columbia is an industrial use jurisdiction when it allowed the ALJ's consideration of evidence of post-injury wages as a factor in determining petitioner's permanent partial disability resulting from claimed partial loss of use. The government defends the CRB's decision, arguing that it is a reasonable interpretation of the District of Columbia Workers' Compensation Act that is not precluded by this court's decision in *Smith*, and is supported by other decisions of this court, including (*Carolyn*) *Jones*. After examining the language, history, and purpose of the relevant portions of the statute, and our jurisprudence interpreting and applying the statute, we agree with the CRB that the District of Columbia Workers' Compensation Act is grounded on principles of industrial use and economic impairment, and defer to the CRB's reasonable determination that consideration of wages is relevant to the industrial use of a scheduled member and may be taken into account as a factor in determining the extent of a worker's loss of use in making a permanent partial disability schedule award under D.C. Code § 32-1508 (3)(U-i).

**1. Overview of District of Columbia Workers' Compensation Act**

It is useful to place the issue presented in this appeal in the context of the overall statutory scheme. The District of Columbia Workers' Compensation Act provides benefits for temporary and permanent disability that results from workplace injuries. D.C. Code § 32-1501 *et seq.* (2012 Repl.) (D.C. WCA). All benefits for temporary disability, whether total or partial, are calculated by reference to the claimant's actual wages. D.C. Code § 32-1508 (2) ("In case of disability total in character but temporary in quality, 66 2/3% of the employee's average weekly wages shall be paid to the employee during the continuance thereof.") and (5) ("In case of temporary partial disability, the compensation shall be 66 2/3% of the injured employee's wage loss . . . .").

Once a work injury has stabilized and the worker has reached maximum medical improvement, the worker may be entitled to benefits for permanent disability. Calculation of permanent disability benefits depends on whether the worker is eligible for one of two types of awards: schedule or non-schedule. D.C. Code § 32-1508 (3)(A)-(U) (schedule award); D.C. Code § 32-1508 (3)(V) (non-schedule award). A non-schedule award involves compensation for disability to a part of the body not specified in the schedule award list and is calculated by reference to the employee's actual wage loss, regardless of whether the permanent disability is total or partial. D.C. Code § 32-1508 (3)(V)(ii). Injuries to the back,

shoulder, or neck, for example, are subject to non-schedule awards. Compensation is calculated with reference to actual wage loss (comparing pre- and post-injury wages) and continues for the duration of wage loss attributable to the on-the-job injury. D.C. Code § 32-1508 (3)(V)(ii)I. A schedule award is for injuries to parts of the body listed in the statute, *e.g.*, arm, leg, finger, eye. D.C. Code § 32-1508 (3)(A-R). Unlike the continuing payments for non-schedule awards, compensation for schedule awards is based on a one-time prospective assessment of economic impact over the life of the injured worker. In the case of permanent total loss or total loss of use of a scheduled member of the body, that prospective assessment has been legislatively determined and is fixed in the statute by reference to a formula: "66 2/3% of the employee's average weekly wages" multiplied by the number of weeks contained in the schedule award list for the specific part of the body. *Id*. In the case of permanent *partial* loss or loss of use of a scheduled member of the body, disability compensation may be made "for proportionate loss or loss of use of that member." D.C. Code § 32-1508 (3)(S). When evaluating a schedule award for such partial loss or loss of use, "the most recent edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment may be utilized, along with the following 5 factors: (i) Pain; (ii) Weakness; (iii) Atrophy; (iv) Loss of endurance; and (v) Loss of function." D.C. Code § 32-1508 (3)(U-i). These five factors, along with evidence of physical

impairment, are used to determine a claimant's disability percentage. Once this percentage of loss of use has been determined, it is then applied to the amount fixed in the statute for total loss or loss of use of the scheduled member to calculate the one-time permanent partial disability award for proportionate loss of use. It is the determination of the percentage of loss of use of a member that is to be employed as a variable in the formula for calculating a schedule award that is at issue in this case.

The D.C. WCA's schedule award provision is based on both the U.S. Longshoremen's and Harbor Workers' Compensation Act ("LHWCA") and the Maryland Workers' Compensation Act, so we review the history and interpretation of the schedule award section of these acts in interpreting the D.C. WCA. *See* 2B SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 52:2 (Norman J. Singer & J.D. Shambie Singer eds., 7th ed. 2015) ("When a state legislature adopts a statute which is identical or similar to one in another state or country, courts of the adopting state usually adopt the original jurisdiction's construction.").

The LHWCA, enacted by Congress in 1927, was made applicable to workers in the private sector of the District of Columbia when Congress enacted legislation specific to the District of Columbia that incorporated the LHWCA provisions, the

Workmen's Compensation Act of 1928, Pub. L. No. 70-419, §§ 1-3, 45 Stat. 600 (1928) (codified at D.C. Code §§ 36-501, -502 (1973)); *see Carey v. Crane Serv. Co.*, 457 A.2d 1102, 1103 n.2 (D.C. 1983). The LHWCA defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U.S.C. § 902 (10) (2012) (originally enacted as Act of March 4, 1927, ch. 509, § 2 (10), 44 Stat. 1424, 1425).[7] The LHWCA provides for both schedule and non-schedule awards. *See* 33 U.S.C. § 908 (c)(1)-(19) (2012) (schedule award), (21) (non-schedule award). In the case of schedule awards, it provides that "[c]ompensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member." 33 U.S.C. § 908 (c)(19) (originally enacted as Act of March 4, 1927, ch. 509, § 8 (c)(19), 44 Stat. 1424, 1428). The Supreme Court has observed, in dictum, that "evidence of loss of wages or wage-earning capacity was considered irrelevant in cases of permanent partial disability falling within the schedule provisions." *Potomac Elec. Power Co. v. Dir., Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 449 U.S. 268, 276-77 (1980) (referring to LHWCA, 44 Stat. 1424, as amended, 33 U.S.C. §§ 901-950 (1976 ed. and Supp.

---

[7] The LHWCA's current definition of "disability" also contains a modification not relevant to this case, but the quoted portion remains unchanged from the original definition contained in the 1927 Act.

III)).[8]

In 1980, the Council of the District of Columbia enacted the Workers' Compensation Act of 1979, D.C. Law 3-77, 27 D.C. Reg. 2503 (1980) (codified at D.C. Code § 32-1501 *et seq.* (2012 Repl.), *formerly* D.C. Code § 36-301 *et seq.* (1981)), and repealed all earlier workers' compensation legislation applicable to the District. *See Carey*, 457 A.2d at 1103 n.2. The Council intended to "amend[] the D.C. Code which incorporate[d] by reference the [LHWCA]." D.C. Council, Report on Bill 3-106 at 2 (Jan. 16, 1980) (hereinafter PS/CA Committee Report). The Council Committee on Public Service and Consumer Affairs (PS/CA Committee) believed that the District's administration of the D.C. WCA would

---

[8] The Court's observation regarding § 908 (c)(19) of the LHWCA was dictum because the *PEPCO* case dealt with the distinct, albeit related, issue of "whether a permanently partially disabled employee, entitled to compensation under the statutory schedule, may elect to receive a larger recovery . . . measured by the actual impairment of wage-earning capacity caused by his injury." 449 U.S. at 270. The Court made the observation noted in the text above to bolster its literal interpretation of the LHWCA as providing two mutually exclusive compensation systems for workplace injuries: one for injuries to members of the body listed on the schedule and another for all other injuries. *See id.* at 273-80. The D.C. WCA also has been interpreted as providing two different and exclusive compensation systems, schedule and non-schedule, for workplace injuries. *See Lenaerts v. District of Columbia Dep't of Emp't Servs.*, 545 A.2d 1234, 1236-39 (D.C. 1988). Neither *PEPCO* nor *Lenaerts* dealt with the specific issue before the court in this appeal: whether evidence of actual wages, as an indicator of wage-earning capacity, may be taken into account in determining whether there is permanent partial disability for a schedule award.

"result in lower costs through more efficient administration and more careful consideration of claims."[9]  *Id.*  According to the PS/CA Committee, two "objectives of the workmen compensation act are:  (1) replacement of wages lost by disabled workers; [and] (2) restoration of earning capacity and return to productive employment . . . ." *Id.* at 6-7.

The D.C. WCA largely adopted provisions of the LHWCA, including the provision for schedule awards for permanent partial disability that the Supreme Court generally observed did not include consideration of loss of wages or wage-earning capacity.  *See supra* note 8 and accompanying text.  There is no indication in the PS/CA Committee Report, however, that the Council was aware of that interpretation of the comparable LHWCA provision.[10]  The D.C. WCA's definition

---

[9]  The D.C. Council referred the D.C. WCA to the D.C. Council Committee on Housing and Economic Development; the PS/CA Committee proposed amendments to the D.C. WCA.  *See* PS/CA Committee Report at 1, 8.

[10]  It is important to note that *PEPCO* was not decided by the Supreme Court until December 1980, after the D.C. Council enacted the D.C. WCA earlier that year; however, the Second Circuit's interpretation of the LHWCA, cited in *PEPCO*, predates the Council's enactment.  *See PEPCO*, 449 U.S. at 276-77, 277 n.15 (citing *Travelers Ins. Co. v. Cardillo*, 225 F.2d 137, 143-44 (2d Cir. 1955)).  The PS/CA Committee Report does not indicate that the Council knew of the Second Circuit's decision in *Travelers Ins. Co.* interpreting the LHWCA schedule provisions as excluding evidence of wage-earning capacity.  We also observe that as in *PEPCO*, the decision in *Travelers Ins. Co.* did not address the question of how the *percentage* of disability should be determined and whether evidence of

(continued . . .)

of "disability" is also substantially similar to the LHWCA's: "'[d]isability' means physical or mental incapacity because of injury which results in the loss of wages." D.C. Workers' Compensation Act of 1979, Act 3-188 at 3 (May 14, 1980); D.C. Code § 32-1501 (8) (2012 Repl.). At the time, an ALJ could adopt a strictly medical analysis of impairment without an obligation to conduct an independent analysis of an impairment's economic impact. *See*, *e.g.*, *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 683 A.2d 470, 473, 477-78 (D.C. 1996) (affirming treating physician's 5% disability rating for legs based on reasonable mathematical conversion derived from physician's 20% disability rating for body as a whole, noting that "claimant qualifies for a schedule award regardless of whether the claimant actually suffers a wage loss as a consequence of the disability"). Thus, the pre-1998 D.C. WCA appears to have been interpreted as considering only physical consequences of an injury in making schedule awards. *See DeShazo v. District of Columbia Dep't of Emp't Servs.*, 638

---

(. . . continued)

wage loss is relevant to that determination. *See generally* 225 F.2d at 143-44. Although the courts' rationale can be read as suggesting the answer is no, the judicial mind was not applied in those cases to the specific question we face here, nor do the cases deal with the potential tension between the LHWCA's definition of "disability" in terms of "incapacity to earn the wages which the employee was receiving at the time of injury" and the courts' statements that "evidence of loss of wages or wage-earning capacity was considered irrelevant" in making awards for permanent partial disability that fall under the schedule. In any event, the language of the D.C. WCA has since diverged from that of the LHWCA, as discussed *infra*.

A.2d 1152, 1156 (D.C. 1994) ("The assumption underlying this approach is that, although the claimant may be able to continue working, the impact of the injury causing a permanent partial disability sooner or later will take its toll, and that the scheduled benefit will be an appropriate, if arbitrary, compensation to offset wage losses that eventually can be anticipated.").

This method for calculating permanent partial loss and loss of use for schedule awards continued until 1998, when the D.C. WCA was amended to require an ALJ to consider the "American Medical Association Guidelines along with 5 other factors to evaluate permanent injuries." Workers' Compensation Amendment Act of 1998, D.C. Act 12-571 at 1, 3 (Dec. 23, 1998). The amendment followed Maryland's five-factor approach to determining permanent partial disability. *See* MD. CODE ANN., LAB. & EMPL. § 9-721 (b) (West 2015). Maryland first adopted the five-factor (pain, weakness, atrophy, loss of endurance, and loss of function) analysis pursuant to the AMA's recommendation that courts should not rely exclusively on medical opinions of physical impairment in deciding whether a disability exists for purposes of workers' compensation. *See Getson v. WM Bancorp*, 694 A.2d 961, 968 (Md. 1997) ("The Commission must do more than merely adopt medical evaluations of anatomical impairment; the Commission must assess the extent of the loss of use by considering how the injury has affected

the employee's ability to do his or her job."). The D.C. Council also took heed of the AMA's recommendation in eschewing exclusive reliance on a medical analysis of impairment and adopted the Maryland factors for determining permanent partial disability in schedule awards. D.C. Council, Report on Bill 12-192 at 8 (Oct. 29, 1998) ("[T]he Committee heeds the AMA warning and adopts the Maryland approach to determine disability, which includes the use of multiple factors.").[11]

The 1998 amendment to the WCA, which adopts consideration of the Maryland factors in addition to the AMA guidelines, squarely rejected a pure physical impairment approach in "determining disability" for schedule awards. D.C. Code § 32-1508 (3)(U-i). The question then is whether this new approach to disability determination permits the CRB's interpretation that evidence of wage loss (or the absence thereof) may be considered in determining a claimant's disability percentage for the purpose of making a schedule award for permanent partial disability. This court has not directly addressed the issue, but as the CRB noted in its decision in petitioner's case, we have intimated that the answer is yes.[12]

---

[11] This change marks a substantial deviation from the LHWCA, which does not contain language requiring consideration of similar factors in determining permanent partial disability for schedule awards. As such, our analysis does not rely on cases interpreting the LHWCA. *See supra* note 10.

(continued . . .)

We turn to examine the CRB's decision in this case to determine whether it presents a reasonable answer that merits our deference.

## 2. The CRB's Decisions

Ordinarily, to determine whether we should defer to the CRB's decision in this case, we would simply review the decision that has been appealed and examine whether it reasonably applies the law and is supported by substantial evidence. (*Carolyn*) *Jones*, 41 A.3d at 1221. However, petitioner directs our attention to, and urges us to follow instead, an earlier decision by the CRB — *Corrigan v. Georgetown Univ.*, CRB No. 06-094, 2007 D.C. Wrk. Comp. LEXIS 364 (Sept. 14, 2007) (en banc), which we discuss more fully *infra* — that came to

(. . . continued)

[12] In (*Carolyn*) *Jones*, 41 A.3d at 1225, we held that we could not conduct a meaningful judicial review of the CRB's decision affirming the ALJ's Compensation Order where the ALJ had not adequately explained how she reached a seven percent disability award for permanent injury to the claimant's knee, which is compensable under the schedule. In our remand order, we suggested that the ALJ could consider wage loss evidence. *See id.* at 1226 ("We also know that the ALJ was properly aware that the disability determination was not the same as physical impairment, and required a determination of economic wage loss."); *id.* at 1226 n.7 ("Although neither the ALJ nor the parties have referred to the relative amounts petitioner received from her full-time and part-time employment, we note that there are documents in the record (one from employer's counsel) that petitioner's wages from her part-time work [that were lost as a result of the work injury] comprised approximately 20% of her overall earnings.").

the opposite conclusion of the CRB's decision in this case. Before we can determine whether the CRB's decision in this case merits deference, therefore, we must examine petitioner's reliance on *Corrigan*.

In *Corrigan*, the CRB, sitting en banc, squarely addressed the issue before us today: whether wage loss should be considered when evaluating the extent of loss of use in determining permanent partial disability for a schedule award. The CRB cited several opinions by this court and the agency and noted that, unlike the Maryland statute, the D.C. WCA does not employ the phrase "industrial use." *Id.* at *30; *see, e.g.*, MD. CODE ANN., LAB. & EMPL. § 9-627 (k)(1) (West 2015). This difference, the CRB stated, is important because "industrial loss of use and effect upon industrial capacity in other jurisdictions has been equated with loss of wage earning capacity." *Corrigan*, 2007 D.C. Wrk. Comp. LEXIS 364 at *30 (internal quotation marks omitted). The CRB ultimately concluded that wage loss could not be taken into account in determining the extent of disability because under the D.C. WCA, a "specific [worker's] loss [of use of a scheduled member] is to be determined without reference to the claimant's earning capacity or ability to return to work. . . . Compensation is paid if the loss has been incurred, and it is not

relevant whether the worker can work after the loss."[13]  *Id.* at *31.  There is no published opinion of this court that has affirmed (or even discussed) the CRB's decision in *Corrigan*.

In 2012, five years after the CRB decided *Corrigan*, a CRB panel decided *Al-Robaie v. Fort Myer Constr. Co.*, CRB No. 10-014, 2012 D.C. Wrk. Comp. LEXIS 250 (June 6, 2012).  In *Al-Robaie,* the CRB vacated the ALJ's decision that the claimant was not entitled to a schedule award because she had not reached maximum medical improvement where the unanimous medical opinion was to the contrary.  *Id.* at *3-*6.  In remanding the case, the CRB cited this court's decisions in *Smith* and (*Carolyn*) *Jones* as supporting the proposition that the ALJ should "reconsider the Claimant's request for permanent partial disability benefits without any consideration of wage loss except to the extent that such wage loss correlates with or is indicative of loss of wage earning capacity or economic impairment." *Id.* at *5-*6 & n.7.

---

[13]  Although the CRB forbade the use of wage loss in assessing the extent of disability and eschewed the notion of industrial loss of use, it also stated that physical impairment could be taken into account in determining its impact on the "ability to earn wages."  *Id*. at *34.

In the case that is before us for review, the CRB panel affirmed the ALJ's Compensation Order, stating, as it had in *Al-Robaie*, that "wage loss [can be considered] to the extent that such wage loss correlates with or is indicative of loss of wage earning capacity or economic impairment." *Dent v. Providence Hosp.*, CRB No. 13-101, 2014 D.C. Wrk. Comp. LEXIS 234 at *11-*12 (May 7, 2014) (emphasis omitted) (quoting *Al-Robaie*, 2012 D.C. Wrk. Comp. LEXIS 250 at *6). The CRB cited this court's opinion in (*Carolyn*) *Jones* and two subsequent CRB opinions, including *Al-Robaie*, for the proposition that "the absolute prohibition upon consideration of the existence and amount of a specific, identifiable loss of wages in a particular case is no longer the law in this jurisdiction . . . ." *Id.*[14] As

---

[14] The "absolute prohibition" referred to by the CRB in *Dent* is an implicit reference to *Corrigan*'s exclusion of evidence of actual wage loss in determining the extent of permanent partial disability for schedule awards. The CRB gave notice of its intent to go en banc in two cases to decide whether "the CRB's decision in [*Corrigan* was] abrogated or modified by [(*Carolyn*) *Jones*]." *Notice of En Banc Review*, *Hoepfl v. Washington Metro. Area Transit Auth.*, CRB No. 13-119 (Nov. 1, 2013); *Notice of En Banc Review*, *Jackson v. Washington Hosp. Ctr.*, CRB No. 13-068 (Nov. 1, 2013). The CRB's decision in *Dent* was stayed pending disposition of the en banc cases, which had reached opposing conclusions regarding the continued validity of *Corrigan*, but the CRB rescinded its decision to consider the cases en banc and they were ultimately decided by a regular CRB panel in each case without resolving the question. *Hoepfl v. Washington Metro. Area Transit Auth.*, CRB No. 13-119, 2014 D.C. Wrk. Comp. LEXIS 154 at *19 (Apr. 7, 2014) (remanding to reopen the record for additional evidence); *Jackson v. Washington Hosp. Ctr.*, CRB No. 13-068, 2014 D.C. Wrk. Comp. LEXIS 179 at *20 (May 30, 2014) (affirming award for permanent partial disability although ALJ found no medical impairment). More recently, the CRB has explicitly stated that "*Corrigan* no longer represents the applicable law, and hasn't since" *Al-*

(continued . . .)

set out *supra*, the CRB explained that this court's opinion in *Smith* does not preclude and (*Carolyn*) *Jones*, 41 A.3d at 1224-26, 1226 n.7, supports the conclusion that there is no such prohibition.

The CRB's decision in this case, taken together with its decision in *Al-Robaie*, indicates a recognition by the CRB that the principle it espoused in *Corrigan* — that evidence of actual wage loss is irrelevant in determining a schedule award under the D.C. WCA — is in tension with this court's decision in *(Carolyn) Jones*, which is binding on the CRB. Thus, the CRB's decision to abandon *Corrigan* was not arbitrary, but reasoned, based on its interpretation of *Smith* and (*Carolyn*) *Jones*. As a result, under established principles of administrative law, our inquiry is not whether *Corrigan* was correct;[15] rather, the question for the court is whether the CRB's decision in this case, following *Al-Robaie*, reflects a reasonable interpretation of the D.C. WCA that merits our

---

(. . . continued)

*Robaie*. *See, e.g.*, *Lee v. Marriott Corp.*, CRB No. 15-134, 2016 D.C. Wrk. Comp. LEXIS 109 at *6 (Mar. 9, 2016); *El Masaoudi v. UNO Chicago Grill*, CRB No. 15-093, 2015 D.C. Wrk. Comp. LEXIS 605 at *8 (Oct. 15, 2015).

[15] The Department of Employment Services, represented by the Office of the Attorney General of the District of Columbia, filed a brief on the merits and participated in oral argument in this case. It does not defend (or indeed cite) *Corrigan*, so we see no need to address it as a matter of judicial deference to an agency interpretation.

deference.  We conclude that it does.[16]

### 3.  The CRB's Decision in This Case Is Reasonable

In this case, as in *Al-Robaie*, the CRB allowed the ALJ to consider evidence of the claimant's actual wage history in making a schedule award, to "the extent to

---

[16] This division is aware of the CRB's decision in (*Kevatte*) *Jones v. Washington Metro. Area Transit Auth.*, CRB No. 13-095, 2014 D.C. Wrk. Comp. LEXIS 236 (June 10, 2014), issued shortly after the CRB's decision in this case, in which the CRB relied on *Corrigan*'s categorical rule that wages are irrelevant in determining disability for schedule awards.  In that case the ALJ denied the claimant's proffer of evidence of her prior employment as a deputy sheriff as part of her "industrial history."  The claimant argued the evidence was relevant to the ALJ's determination of the extent of her disability for a schedule award, because, as a result of the injuries she sustained while employed as a bus driver, she lost wage-earning capacity as she could no longer meet the requirements for a higher-paying position in law enforcement even though she was able to resume driving a bus.  A divided panel of the CRB affirmed the Compensation Order, agreeing with the ALJ's exclusion of evidence of the claimant's prior employment history.  A majority of the CRB panel referred to *Corrigan*'s prohibition on considering "the claimant's earning capacity or ability to return to work" in determining "specific loss" (i.e., the percentage loss or loss of use of a scheduled member) because "compensation is paid if the loss has been incurred, and it is not relevant whether the worker can work after the loss."  *Id.* *9 (quoting *Corrigan*, 2007 D.C. Wrk. Comp. LEXIS 364 at *30-*31).  One of the panel members disagreed.  *See id.* at *14-*17 (Leslie, AAJ, dissenting) (noting that each claim for disability presents "a complex of factors" to be considered by the ALJ and explaining that "[p]rior vocational history can be a relevant factor in determining how the industrial accident has impaired Claimant's ability to earn income (i.e., potential for wage loss)").  On petition for review of the CRB's decision, the court today remands the case to the CRB for further consideration.  (*Kevatte*) *Jones v. District of Columbia Dep't of Emp't Servs.*, No. 14-AA-696 (D.C. May 4, 2017).

which such wage loss correlates with or is indicative of loss of wage earning capacity or economic impairment." We conclude that the CRB's decision is based on a reasonable interpretation of an ambiguous provision in the D.C. WCA and thus merits our deference. There are several reasons why we so conclude. We begin with the plain language of the text, which is the first step in interpreting a statute. *See Eaglin v. District of Columbia*, 123 A.3d 953, 955 (D.C. 2015). The specific provision at issue in this case provides that "[c]ompensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member." D.C. Code § 32-1508 (3)(S). It neither mandates nor prohibits consideration of evidence of actual wages in determining a claimant's "proportionate . . . loss of use." Thus, the CRB's decision to consider evidence of a claimant's post-injury loss of wages in determining whether the claimant has suffered "proportionate . . . loss of use" is permissible if supported by other indicators of statutory interpretation.

Second, the 1998 amendment of the D.C. WCA provided further direction in how to "determin[e] disability" in making schedule awards for permanent partial disability by listing five factors — pain, weakness, atrophy, loss of endurance, and loss of function — in addition to physical impairment. D.C. Code § 32-1508 (3)(U-i). As "disability" is defined in the D.C. WCA in economic terms — as

"incapacity because of injury which results in the loss of wages," D.C. Code § 32-1501 (8) — it makes sense to interpret "[l]oss of function," for example, as incorporating at least in part the notion of a loss of economic function. Applying the Maryland factors, in *Getson* the Maryland Court of Appeals provided as an example of the proper consideration of disability a workplace injury suffered by a freight checker and a pianist that results in amputation of both thumbs — a schedule award under both the Maryland and District of Columbia workers' compensation acts — that would yield significantly different disability ratings depending on the ability to return to "pre-accident duties . . . [n]otwithstanding the similarity of the injuries. . . ." *Getson*, 694 A.2d at 968 (internal quotation marks omitted). Evidence of wage loss could similarly be connected to any of the other factors listed in the statute to the extent that there is a logical nexus between wages and the factor at issue. For example, a worker may be able to continue to work, but not full-time, because of pain, weakness, or loss of endurance. Thus, the CRB's determination that evidence of wages — either wage loss or the ability to maintain the same level of wages post-injury — is relevant in determining a claimant's disability percentage for a schedule award has support in the text of the statute.

Third, the CRB's decision to permit consideration of evidence of actual

wage loss as a factor in determining a claimant's permanent disability percentage for a schedule award is consonant with two of the D.C. WCA's objectives: "replacement of wages lost by disabled worker[s]" and "restoration of earning capacity and return to productive employment." PS/CA Committee Report at 6-7. We have repeatedly commented that this economic orientation is reflected in the D.C. WCA's definition of disability, which establishes a link between mental or physical incapacity because of injury and a resulting wage loss. D.C. Code § 32-1501 (8). As this court noted in *Smith*, 548 A.2d at 100, "compensation under the Act is predicated upon the loss of wage earning capacity, or economic impairment, and not upon functional disability or physical impairment." In *Negussie v. District of Columbia Dep't of Emp't Servs.*, 915 A.2d 391, 396-99 (D.C. 2007), this court relied on the legislative history of the 1998 amendment, *Smith*, and Maryland cases to explain that the ALJ is not bound by medical assessments of physical impairment when calculating a disability percentage for schedule awards, which are intended to compensate for economic loss. This court held:

> ALJs have discretion in determining disability percentage ratings and disability awards because, as used in the Act, *"disability" is an economic and legal concept which should not be confounded with a medical condition*, and . . . in this case the ALJ erred by following decisions of the Director of DOES that require ALJs to choose a disability percentage rating provided either by the claimant's or the employer's medical examiner.

*Id.* at 398-99 (emphasis added). Numerous statements by this court emphasize that "[d]isability . . . is an economic concept rather than a medical condition." *Washington Post v. District of Columbia Dep't of Emp't Servs.*, 853 A.2d 704, 707 (D.C. 2004) (citing *Washington Post v. District of Columbia Dep't of Emp't Servs.*, 675 A.2d 37, 41 (D.C. 1996)); *see also Potomac Elec. Power Co. v. District of Columbia Dep't of Emp't Servs.*, 835 A.2d 527, 531 (D.C. 2003) ("Disability is an economic and not a medical concept.") (quoting *Harris v. District of Columbia Dep't of Emp't Servs.*, 746 A.2d 297, 301 (D.C. 2000)); *Upchurch v. District of Columbia Dep't of Emp't Servs.*, 783 A.2d 623, 627 (D.C. 2001) ("Disability is an economic and not a medical concept, and any injury that does not result in loss of wage-earning capacity cannot be the foundation for a finding of disability."); *Smith*, 548 A.2d at 101 ("A schedule award is intended to compensate only for economic, not physical, impairment."). We have recently decided that the five Maryland factors are limited to proving loss of wage-earning capacity and do not encompass impairments to a claimant's personal and social life "because those are beyond the economic scope of the act." *M.C. Dean, Inc. v. District of Columbia Dep't of Emp't Servs.*, 146 A.3d 67, 77 (D.C. 2016) (citing *Smith*, 548 A.2d at 100, and *Upchurch*, 783 A.2d at 627). Using evidence of actual wages in applying the statutory factors to determine a claimant's disability percentage for a schedule

award furthers the legislative objective of compensating claimants for the economic harm of loss of wage-earning capacity. As Professor Larson has commented, "[i]t is earning capacity that should be crucial; actual wage-loss is significant as the best evidence of loss of earning capacity, but obviously some adjustment based on what the worker is 'able to earn' must be made[.]" Arthur Larson, *The Wage-Loss Principle in Workers' Compensation*, 6 WM. MITCHELL L. REV. 501, 525 (1980) [hereinafter Larson, Wage-Loss Principle].

Fourth, the CRB's determination to permit consideration of the actual impact on wages in determining the extent of "proportionate" loss or loss of use in a case of permanent partial disability provides a useful tool for ALJs tasked with exercising discretion based on the understanding that "'disability' is an economic and legal concept." *Negussie*, 915 A.2d at 398-99. There is an important distinction between determining the extent of disability by taking account of pre- and post-injury wages as a factor to be considered by the ALJ in applying this economic concept and calculating the amount of disability compensation using the formula prescribed in the statute after the extent of disability has been found. The former is a finding of fact by the ALJ of the percentage loss of industrial use of the schedule member (0 - 100%) based on a weighing of the facts relevant to the individual claimant, whereas the latter is a straightforward mathematical

calculation that uses the ALJ's finding of percentage loss of use as part of a statutory formula (% loss of use X 2/3 average weekly wage X number of weeks fixed in the statute for the schedule member). It is the latter method of calculating the amount of compensation as provided in the statute that we have said is not subject to alteration or dependent on actual wage loss because it reflects a conclusive legislative determination of the likely eventual loss of wage-earning capacity in case of loss or loss of use of the parts of the body specified in the schedule. *See DeShazo*, 638 A.2d at 1156 (noting that "scheduled benefit will be an appropriate, if arbitrary, compensation to offset wage losses that eventually can be anticipated"); *Smith*, 548 A.2d at 101 (quoting LARSON for proposition that "the schedule was never intended to be a departure from or an exception to the wage-loss principle"); *Lenaerts v. District of Columbia Dep't of Emp't Servs.*, 545 A.2d 1234, 1236-39 (D.C. 1988) (distinguishing between different and mutually exclusive formulas for calculating compensation for schedule and non-schedule work injuries).

None of the foregoing should be read to imply that evidence of wage loss is either necessary or sufficient to justify a schedule award for permanent partial disability, however. We do not read the CRB's decision as conferring any special weight to evidence of wage loss, or the absence thereof. Such evidence is merely

one factor that may be considered by the ALJ and the CRB in making a schedule award for permanent partial disability to compensate for loss of wage-earning capacity. As the D.C. WCA permits consideration of the AMA guidelines as well as the five Maryland factors in making that predictive judgment, D.C. Code § 32-1508 (3)(U-i), it is quite possible that a claimant could recover a schedule award for permanent partial disability despite evidence that the claimant has experienced no actual wage loss, as a result of a showing of some combination of physical impairment under the AMA guidelines, pain, weakness, atrophy, loss of endurance, or loss of function that support a finding that a claimant's wage-earning capacity has been, or is likely to be, compromised. Contrariwise, it is possible that a claimant could fail to recover a schedule award despite evidence that the claimant experienced actual wage loss, if the remaining evidence points in favor of finding either no physical or mental incapacity caused by the workplace injury or an insufficient link between the incapacity and wage loss, as required by the definition of disability.

The ALJ's ability to come to a considered judgment of the extent of permanent partial disability is particularly important in the context of a schedule award. Because a schedule award is a one-time payment meant to compensate for the loss of future wage-earning capacity resulting from a work injury, it necessarily

involves an element of "prediction." *See* (*Carolyn*) *Jones*, 41 A.3d at 1224. Determining the extent of disability thus requires a highly fact-bound inquiry that takes into account the particulars of the individual claimant, such as employment skills, experience, age, education, and reasonable prospects; evidence of post-injury wages, compared with pre-injury wages, may be more or less probative of loss of future wage-earning capacity depending on the facts of the case. It is for the ALJ to consider and weigh the relevant evidence presented in a given case. *See id.* ("[R]ecognizing that in making a legal determination of disability, the ALJ comes to a conclusion based on a complex of factors, taking into account physical impairment and potential for wage loss, and the application of judgment based on logic, experience and even 'prediction.'"); Larson, *Wage Loss Principle* at 524 n. 94 ("'The loss of earning capacity' concept leaves room for adjustment in both pre- and post-injury earnings, to arrive at an accurate representation of true impact attributable to the injury. For example, allowances may be made for economic increases in wage levels, for changes in the claimant's age, training, or hours, for distortion of wage by employer sympathy, or for the impermanence of particular post-injury earnings.").

In this case, for example, the ALJ had the benefit of a long course — ten years of continued full-time employment after the injury, without any sign of

letting up or wage loss — to draw upon as one factor in determining that the 5% physical impairment of the arm had not had any impact on petitioner's ongoing capacity to earn wages. The ALJ did not use "the ups and downs of actual wages," *DeShazo*, 638 A.2d at 1156, to dictate the question of permanent partial disability in calculating the schedule award but rather took the petitioner's extended work history into account, along with the consequence of the injury on all aspects of petitioner's life, and finding none, came to the ultimate judgment that petitioner was not disabled for purposes of workers' compensation.

In light of the foregoing analysis, we conclude that the CRB's Decision and Order affirming the ALJ's Compensation Order was based on a reasonable interpretation of the D.C. WCA.

## B.  Evidence of Continuing Medical Care

Petitioner argues that the CRB erred in affirming the ALJ's consideration of the character and regularity of the medical care petitioner received for her shoulder injury when assessing her disability.  The government first contends that petitioner's argument is precluded by the invited error doctrine; in the alternative, it argues that the CRB properly affirmed the ALJ's use of those factors.  Since the

CRB did not rely on the invited error doctrine, this court cannot do so on appeal. *See Bowles v. District of Columbia Dep't of Emp't Servs.*, 121 A.3d 1264, 1269 (D.C. 2015) ("An administrative order can only be sustained on the ground relied on by the agency.") (internal quotation marks omitted). Addressing the merits, we conclude that the CRB properly found that the ALJ could consider those factors.

Petitioner's argument is two-fold: that continuing medical care is not required to prove the existence of a permanent partial disability because the underlying injury is permanent, and that the ALJ's reliance on the absence of medical records of continuing treatment was therefore erroneous. Petitioner is correct that such evidence is not required because an impairment must reach "maximum medical improvement" prior to an award for permanent disability, meaning that no further treatment will improve the underlying injury. *See Logan v. District of Columbia Dep't of Emp't Servs.*, 805 A.2d 237, 241 (D.C. 2002) (citing, *inter alia*, 4 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 80.04, at 80-13 (Matthew Bender ed. 2002) ("Permanent means lasting the rest of claimant's life. A condition that, according to available medical opinion, will not improve during the claimant's lifetime is deemed to be a permanent one.")). That the evidence is not required, however, does not mean that it is irrelevant, as the nature and regularity of continuing medical care after the injury has stabilized may

be useful information in assessing the statutory factors of pain, weakness, atrophy, loss of endurance, and loss of function that contribute to the calculation of the extent of disability caused by a permanent injury. Evidence of continuing medical care is routinely presented to support (or deny) the existence of a disabling condition. If the character or regularity of medical care were not admissible, claimants could no longer rely on medical records to corroborate that they have continued to experience pain, weakness, atrophy, loss of endurance, or loss of function even after their injury reached maximum medical improvement. This court has noted that a "dearth of evidence of medical analysis and treatment" is significant when assessing whether a claimant is entitled to a schedule award. *Golding-Alleyne v. District of Columbia Dep't of Emp't Servs.*, 980 A.2d 1209, 1217 (D.C. 2009).

The CRB commented in this case, "How frequently a claimant seeks medical care, or takes pain medication, or takes any number of actions can certainly shed light on the degree to which that claimant suffers from a medical condition and how severe that injury or condition is. . . . [T]he severity of an injury is a primary factor in reaching a reasoned conclusion regarding the degree of disability." Consistent with this common-sense notion, petitioner testified at the hearing that she was receiving ongoing care and medication for her right shoulder

to ameliorate pain from the injury she sustained eleven years earlier. In light of this testimony, it was perfectly reasonable for the ALJ to consider the lack of supporting medical records when assessing petitioner's credibility as to whether she had, in fact, received such continuing treatment in connection with her right shoulder. Accordingly, the CRB did not err in affirming the ALJ's Compensation Order on this point.

## C. Review for Substantial Evidence

Petitioner contends that because the CRB did not properly articulate the substantial evidence standard of review, it therefore erred as a matter of law in concluding that the ALJ's credibility determinations were supported by substantial evidence, without conducting an independent substantial evidence analysis. Petitioner focuses on the following statement in the CRB's Order: "Given the deference accorded to the fact finder on credibility issues, *we will not substitute our judgment for that of the ALJ*. And, lest one forget, the ability to assess appearance and demeanor are still important reasons for according much deference to the person who heard the evidence, even if they are not the only reasons to do so." (emphasis added).

As a matter of law, the CRB does have the authority to make a judgment on the legal sufficiency of the ALJ's credibility determination, even under the deferential substantial evidence standard of review. *See Georgetown Univ. v. District of Columbia Dep't of Emp't Servs.*, 985 A.2d 431, 433 n.2 (D.C. 2009) ("[T]he ALJ of course retains the fact-finder's prerogative to weigh the two doctors' opinions and assess their credibility, subject again to review for substantial evidence."). An absolute prohibition on the CRB's review of the basis for the ALJ's judgment on credibility issues would be at odds with the requirement that there be substantial evidence supporting the ALJ's order. Even if the CRB may, as a matter of law, reject a credibility determination as insufficiently substantiated, this is not such a case, as the ALJ's findings were well supported. The ALJ's determination that "Claimant was not a credible witness" was not based solely on an unreviewable assessment of demeanor, but also, as the CRB noted, on the consideration that petitioner's testimony "did not hang together." The ALJ pointed to specific factors that lent substantial evidentiary support to this determination: "the remoteness of [petitioner's] claim, the lack of evidence to support her testimony of ongoing symptoms related to the injury, [and the] lack of medical evidence to support testimony that she is currently receiving ongoing treatment related to the injury . . . ." AHD Order at 3, 9.

*******

For the foregoing reasons, the CRB Decision and Order affirming the ALJ's Compensation Order is

*Affirmed*.

*******