*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-832

HOWARD UNIVERSITY HOSPITAL, PETITIONER,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

JAMES M. LYLES, JR., INTERVENOR.

On Petition for Review of an Order of the
District of Columbia Department of Employment Services
Compensation Review Board
(CRB-36-17)

(Argued September 25, 2018                    Decided January 31, 2019)

*William H. Schladt* for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the statement was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the statement was filed, filed a statement in lieu of brief.

*David J. Kapson*, with whom *Kevin H. Stillman* was on the brief, for intervenor.

Before THOMPSON and MCLEESE, *Associate Judges*, and PRYOR, *Senior Judge*.

MCLEESE, *Associate Judge*: Petitioner Howard University Hospital (HUH) challenges an award of workers' compensation to intervenor James M. Lyles, Jr. We vacate and remand for further proceedings.

**I.**

Mr. Lyles worked for HUH as a radiological technician. In 2013, he felt pain in his right shoulder while lifting a patient to prepare for an x-ray. Mr. Lyles received medical treatment and eventually filed a workers' compensation claim seeking disability benefits pursuant to D.C. Code § 32-1508 (3)(A) and (S) (2012 Repl.), which provide for compensation for permanent partial loss of the use of an arm. HUH did not dispute that Mr. Lyles had suffered a work-related injury and was entitled to some compensation. HUH and Mr. Lyles presented conflicting evidence about the extent of Mr. Lyles's disability.

At a February 2017 hearing before an administrative law judge (ALJ), Mr. Lyles testified that he still felt a burning and tearing sensation from his neck down into his arm, which was aggravated by motions such as lifting, pulling, and pushing. He further testified that his right arm was very weak and that he therefore did not use his right arm as much as he used to. At the time of the hearing, Mr. Lyles was

working for a new employer as a radiological technician/medical assistant. His duties for his new employer did not include pulling or lifting of patients or machinery. Mr. Lyles also testified that he was no longer able to bowl or lift heavy weights at the gym. Mr. Lyles acknowledged that he had suffered a previous injury to his right shoulder in 2011, while working for a different employer, and had claimed disability benefits from his employer in connection with that injury. That disability claim was settled.

Mr. Lyles introduced the results of an independent medical examination conducted in 2016 by Dr. Matthew Menet. Dr. Menet concluded that Mr. Lyles still had difficulty lifting, reaching, and pulling. In opining about the extent of Mr. Lyles's disability, Dr. Menet relied upon the Fourth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guides). Dr. Menet also considered pain, loss of function, weakness, and loss of endurance. Dr. Menet concluded that Mr. Lyles had a 47% permanent impairment to his right upper extremity. That figure rested on adding the following specific impairments: 3% based on lack of full range of motion, 12% for pain, 10% for weakness, 12% for loss of function, and 10% for loss of endurance. According to Dr. Menet, 20% of the 47% impairment was related to Mr. Lyles's 2011 injury and 27% was related to Mr. Lyles's 2013 injury.

HUH introduced the results of an independent medical examination conducted in 2016 by Dr. Mark Scheer. Dr. Scheer relied on the Sixth Edition of the AMA Guides, as well as his assessment of Mr. Lyles's pain, weakness, atrophy, loss of function, and loss of endurance. Dr. Scheer concluded that Mr. Lyles had a 4% permanent impairment to his right upper extremity. According to Dr. Scheer, 2% of the 4% impairment was preexisting and 2% was related to Mr. Lyles's 2013 injury.

The ALJ credited Mr. Lyles's testimony and gave greater weight to Dr. Menet's opinion than to Dr. Scheer's opinion. With one exception, the ALJ adopted Dr. Menet's calculations in determining the extent of Mr. Lyles's disability. The exception was that the ALJ did not accept the 10% impairment based on loss of endurance, because Mr. Lyles had returned to full-time work as a radiological technician/medical assistant. The ALJ therefore concluded that Mr. Lyles had suffered a 37% permanent disability to his right upper extremity.

The ALJ further concluded that HUH should be held responsible for all of the impairment at issue, not solely the portion of the impairment that was caused by Mr. Lyles's most recent injury. The ALJ explained that apportionment of disability was precluded by D.C. Code § 32-1508 (6)(A) ("If an employee receives an injury,

which combined with a previous occupational or nonoccupational disability or physical impairment causes substantially greater disability or death, the liability of the employer shall be as if the subsequent injury alone caused the subsequent amount of disability . . . .").

HUH argued to the ALJ that, in determining the amount of Mr. Lyles's award under § 32-1508 (3)(A) and (S), the ALJ should not consider the impairment to Mr. Lyles's shoulder, because the shoulder is not part of the arm. Relying on the decision of the Compensation Review Board (CRB) in *Lawson*, CRB No. 14-056(R), 2017 WL 576074 (Jan 11, 2017), the ALJ concluded that the shoulder is part of the arm for purposes of § 32-1508.

HUH sought review before the CRB, which affirmed the ALJ's compensation order. Among other things, HUH argued that, in calculating the amount of Mr. Lyles's disability, the ALJ had not explained the connection between Mr. Lyles's physical impairments and the extent of Mr. Lyles's disability. The CRB acknowledged that ALJs must specifically explain the nexus between physical-impairment factors -- including pain, weakness, atrophy, loss of endurance, and loss of function -- and a claimant's "industrial capacity." The CRB concluded, however, that the ALJ had adequately explained his conclusions.

Finally, the CRB concluded that § 32-1508 (6)(A), the provision the ALJ relied upon as precluding apportionment, had not been repealed by § 2 (e)(2) of the Workers' Compensation Amendment Act (WCAA). D.C. Act 12-571, 46 D.C. Reg. 891, 893-94 (1999). We discuss the CRB's reasoning on that point more fully later in this opinion.

## II.

We review a decision of the CRB to determine whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Reyes v. District of Columbia Dep't of Emp't Servs.*, 48 A.3d 159, 164 (D.C. 2012) (internal quotation marks omitted). "Our principal function in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues." *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C. 2007) (internal quotation marks omitted). We must defer to the CRB's reasonable interpretation of statutes that the CRB is charged with administering. *See, e.g.*, *Pierce v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 882 A.2d 199, 205 (D.C. 2005).

## A.

HUH argues that the award to Mr. Lyles should be reduced because some of Mr. Lyles's impairment was attributable to an earlier injury. HUH does not dispute that § 32-1508 (6)(A) by its terms precludes apportionment of disability. Rather, HUH argues that § 32-1508 (6)(A) was subsequently repealed, and an employer therefore now must only compensate that portion of a claimant's disability that is attributable to a workplace injury that occurred during the claimant's current employment. We remand this issue for further consideration by the CRB.

As enacted in 1980, the Workers' Compensation Act (WCA) permitted apportionment of disability, requiring a claimant's current employer to compensate the claimant for only the new portion of a disability that arose in part from a prior injury and in part from a new injury. D.C. Act 3-188, § 9 (f), 27 D.C. Reg. 2503, 2516 (1980). The WCA did provide for additional compensation in such circumstances, but that compensation was paid by a special fund created for that purpose. *Id.* Such funds, often called second-injury funds, have been a common feature of modern workers' compensation statutes. 8 Lex K. Larson & Thomas A. Robinson, *Larson's Workers' Compensation Law* § 91.01 (2018).

The WCA was subsequently amended, however, in two pertinent respects. First, in cases involving disability arising in part from prior injury and in part from a subsequent injury, employers were made responsible "as if the subsequent injury alone caused the subsequent amount of disability." D.C. Code § 32-1508 (6)(A). Thus, apportionment of disability was no longer permitted. *Daniel v. District of Columbia Dep't of Emp't Servs.*, 673 A.2d 205, 208 (D.C. 1996) (discussing provision as previously codified at D.C. Code § 36-308 (6)(A) (1993 Repl.)). Presumably to mitigate the effect of that change on employers, and to avoid creating disincentives to the hiring of disabled workers, the WCA provided that the special fund would reimburse employers for benefits paid after 104 weeks. D.C. Code § 32-1508 (6)(A)(iii), (B).

The provision currently at issue is § 2 (e)(2) of the WCAA, which provides that "Section 9 (D.C. Code § 36-308) [of the WCA] is amended as follows: . . . A new subsection (f)(3) is added to read as follows: '(3) The requirements of this subsection shall apply to injuries occurring prior to the effective date of the Workers' Compensation Amendment Act of 1998.'" 46 D.C. Reg. 893-94. Interpreting this provision requires a brief detour into the terminology and practices of statutory drafting and codification.

In drafting legislation, the D.C. Council, like the United States Congress, "ordinarily adheres to a hierarchical scheme in subdividing statutory sections," using subsections starting with (a); paragraphs starting with (1); subparagraphs starting with (A), and clauses starting with (i). *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60-61 (2004). Applying that convention to the WCA as enacted, subdivision (f) of § 9 of the WCA is a subsection. The provision of the WCAA at issue, § 2 (e)(2), by its terms makes the requirements of § 9 (f) inapplicable to injuries that occur after the effective date of the WCAA. Thus, as the CRB acknowledged, § 2 (e)(2) of the WCAA by its terms appears to apply to the entire subsection of the WCA that addressed apportionment. *Cf., e.g.*, *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 938-39 (2017) (statutory cross-reference to section included all subsections of section). That would seemingly include the provision (now codified at D.C. Code § 32-1508 (6)(A)) that the ALJ relied upon as precluding apportionment.

We pause to note a complication created by the way in which the WCA has been codified. As currently codified, § 32-1508 is unconventionally labelled. Rather than having subsections labelled with lower-case letters starting with (a), § 32-1508 is initially subdivided using Arabic numerals starting with (1). D.C. Code § 32-1508. The codifier thus appears to have codified § 32-1508 as having no

subsections, making § 32-1508 (6) a paragraph. Presumably for that reason, the codifier changed the word "subsection" in § 2 (e)(2) of the WCAA to "paragraph" when codifying § 2 (e)(2). D.C. Code § 32-1508 (6)(C). It is a standard practice for codifiers to make conforming changes, including changes to cross-references. *See generally* Linda W. Cropp & Charlotte Brookins-Hudson, *Preface to the 2001 Edition of the D.C. Official Code* vi (2012 Repl.) (D.C. Council's Office of General Counsel codifies enactments of D.C. Council, including "interpret[ing] any discrepancies in the drafting of the laws[,] using commonly recognized rules of statutory construction"); 2 U.S.C. § 285b(4) (2017) (duties of federal Office of the Law Revision Counsel include "classify[ing] newly enacted provisions of law to their proper positions in the Code"). That appears to be what the codifier did in codifying § 2(e)(2) of the WCAA. As codified, that provision is a subparagraph, § 32-1508 (6)(C), that by its terms prospectively repealed the requirements in the rest of paragraph (6), including § 32-1508 (6)(A) and (B).

As noted, the CRB acknowledged that § 32-1508 (6)(C) by its terms could be read to have prospectively repealed all of § 32-1508 (6). Nevertheless, relying primarily on the WCAA's lengthy title (which the CRB referred to as a preamble), the CRB concluded that the D.C. Council had intended only to repeal the special fund that provided reimbursement to employers in cases involving disability that

arose in part from a prior injury and in part from a new injury, and that the D.C. Council had not intended to "[b]ring[] apportionment into the picture." *See* 46 D.C. Reg. 891 (1999) (WCAA's title refers in pertinent part "to repeal [of] the subsequent injury fund provisions with respect to injuries occurring after the effective date of this act"; no mention of apportionment of disability). By itself, however, the title of the WCAA is not a sufficient basis upon which to decline to give effect to the plain language of the text of § 2 (e)(2). *See, e.g.*, *Mitchell v. United States*, 64 A.3d 154, 156 (D.C. 2013) (title of provision "cannot limit the plain meaning of the text") (internal quotation marks omitted); *see also, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008) ("[I]n America the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms.") (internal quotation marks omitted).

In this court, HUH argues among other things that repealing the special-injury fund while still precluding apportionment is bad policy and requires subsequent employers to bear the expense of excessive disability payments to workers. HUH also argues that the CRB treated § 2 (e)(2) as prospectively repealing only § 32-1508 (6)(B), which addresses the special-fund reimbursement, without considering whether § 2 (e)(2) also prospectively repealed § 32-1508 (6)(A)(iii). As previously noted, in cases in which a claimant's current disability rests in part on a prior

disability, the latter provision appears to limit the extent of the current employer's obligation to pay monetary benefits to 104 weeks.  D.C. Code § 32-1508 (6)(A)(iii).  Thus, HUH argues, if only § 32-1508 (6)(B) was repealed, claimants in such cases would be limited to 104 weeks' compensation and thus might not receive full compensation.  The CRB did not explicitly address whether § 2 (e)(2) of the WCAA also repealed § 32-1508 (6)(A)(iii).

We conclude that the matter must be remanded for the CRB to further consider the proper interpretation of § 2(e)(2) of the WCAA and its implications for apportionment under the WCA.  As we have noted, the CRB in this case relied primarily on the title to the WCAA, which by itself cannot provide a basis for disregarding clear textual language.  In a subsequent decision, the CRB discussed the issue somewhat more fully, taking into account the legislative history of the WCAA and discussing underlying considerations of policy.  *Brown*, CRB No. 16-020(R), 2018 WL 4854481, at *4-6 (Sept. 5, 2018).  Nevertheless, neither in this case nor in *Brown* did the CRB address the questions posed by the interaction of § 2 (e)(2) of the WCAA and D.C. Code § 32-1508 (6)(A)(iii).  "[A]cknowledging the CRB's expertise and responsibility for administering the [WCA]," we "remand[] the case to enable the CRB to consider [that issue] in the first instance."  *Levy v. District of Columbia Dep't of Emp't Servs.*, 84 A.3d 518, 521 (D.C. 2014) (brackets

and internal quotation marks omitted). We express no view on the proper resolution of that issue.

**B.**

HUH also challenges the CRB's conclusion that the shoulder is part of the arm for purposes of D.C. Code § 32-1508 (3)(A) and (S). We agree with HUH's challenge.

By way of background,

> The Workers' Compensation Act divides permanent partial disabilities into two categories, "schedule" and "non-schedule." Schedule disabilities are those involving the loss or impairment of certain specified body parts, e.g., the loss of an arm, leg, or eye. For each such injury, a worker is entitled to receive 66 2/3% of his or her average weekly wages for a fixed number of weeks that varies depending on the particular body part injured . . . , regardless of the actual wage loss the worker sustains as a result of the injury.

*Brown v. District of Columbia Dep't of Emp't Servs.*, 83 A.3d 739, 743 n.6 (D.C. 2014). If a claimant loses partial use of a specified body part, the claimant is entitled to compensation in proportion to the degree of loss of use. D.C. Code § 32-1508 (3)(S). In determining the degree of loss of use of a schedule body part, the following factors may be considered: the most recent edition of the AMA Guides,

pain, weakness, atrophy, loss of endurance, and loss of function.  D.C. Code § 32-1508 (3)(U-i).  "In contrast, for other partially disabling injuries (i.e., to parts of the body not listed in the 'schedule,' such as the back or neck), the worker's disability compensation is measured by his or her actual or imputed wage loss attributable to the injuries.  *See* D.C. Code § 32–1508 (3)(V)."  *Brown*, 83 A.3d at 743 n.6.

In the present case, Mr. Lyles sought a schedule award under D.C. Code § 32-1508 (3)(A) and (S), which govern the partial loss of use of an arm.  Some of the impairments upon which Mr. Lyles relied were to Mr. Lyles's shoulder.  To determine the degree to which Mr. Lyles lost the use of his arm, it thus was necessary to decide whether the shoulder is properly understood to be part of the arm for the purpose of determining a schedule award.

In *M.C. Dean, Inc. v. District of Columbia Department of Employment Services*, 146 A.3d 67, 70-75 (D.C. 2016), this court addressed a case in which the CRB appeared to have treated the shoulder as part of the arm for the purpose of determining a schedule award.  The court noted, however, that "the Department of Employment Services has previously interpreted the [WCA] to exclude the neck and shoulder from schedule arm awards."  *Id* at 73.  We therefore remanded the case for the CRB to "clarify the definition[] of 'arm.'"  *Id.* at 75.

On remand in the *Dean* case, the CRB concluded that the arm includes the shoulder for the purpose of determining a schedule award. *Lawson*, 2017 WL 576074, at *8. In the present case, the CRB relied upon in its earlier conclusion in *Lawson*, so our focus is on the CRB's analysis in *Lawson*. In *Lawson*, the CRB noted that the WCA provides that the AMA Guides may be considered in "determining disability." *Id.* at *5 (quoting D.C. Code § 32-1508 (3)(U-i)). For purposes of analyzing impairment, the AMA Guides use the term "upper extremit[y]" rather than "arm," and they define the upper extremity to include four regions: the shoulder region, the elbow region, the wrist region, and the digit/hand region. *Id.* at *6. Thus, the CRB concluded, "it is reasonable to infer that by making the [AMA] Guides an appropriate benchmark for assessing objective medical impairment, [the D.C.] Council intended that the anatomical description of the relevant body parts referenced in the [AMA] Guides would correspond to the anatomical body parts listed in the schedule." *Id.* at *8. The principal difficulty with this line of reasoning is that the body parts referenced in the AMA Guides do not correspond to the body parts listed in the schedule in D.C. Code § 32-1508 (3)(A)-(Q). Specifically, the AMA Guides include the hand and fingers as part of the upper extremity, *Lawson*, 2017 WL 576074, at *6, but the hand and fingers are treated separately from the arm under the statutory schedule, D.C. Code § 32-1508 (3)(A),

(C), (F), (G), (I), (J), (L) (separate provisions specifying amounts of compensation for loss of arm, hand, and fingers). The D.C. Council thus could not reasonably be understood to have intended for the anatomical divisions used in the AMA Guides to determine the interpretation of the anatomical terms used in the statutory schedule. Rather, the D.C. Council appears to have intended that the AMA Guides would be used in determining the degree of disability. We therefore are not persuaded by the CRB's reason for concluding that the shoulder should be treated as part of the arm.

Mr. Lyles advances an additional argument in support of the CRB's conclusion. According to Mr. Lyles, "[t]he CRB concluded that sound public policy supports finding the shoulder is part of the arm, because the CRB has focused more and more on the place of functional disability, rather than the situs of injury, to assign disability under the [WCA]." Mr. Lyles's argument rests on a misunderstanding of the CRB's ruling in *Lawson*. In the passage from *Lawson* on which Mr. Lyles relies, the CRB described the competing arguments of the parties, without adopting those arguments. 2017 WL 576074, at *7. In general, an administrative order cannot be affirmed on grounds not relied upon by the agency. *E.g.*, *Douglas-Slade v. U.S. Dep't of Transp.*, 959 A.2d 698, 702 (D.C. 2008). In any event, the argument presented by the employer in *Lawson* conflates two distinct issues. It is well settled under our law that a claimant who suffers an injury to a part of the anatomy that is

not listed in the statutory schedule may nevertheless seek recovery under the schedule if the consequence of that injury is the total or partial loss of use of a part of the anatomy that is listed in the statutory schedule. *See, e.g.*, *M.C. Dean, Inc.*, 146 A.3d at 73 ("[I]t is not the situs of the injury which determines whether a schedule award is payable; it is the situs of the disability resulting from the injury which is controlling.") (internal quotation marks omitted). Thus, even if the shoulder is not considered part of the arm, injury to the shoulder might provide a basis for a schedule award based on total or partial loss of use of the arm. Moreover, if the shoulder is not part of the arm, then a claimant who suffers injury to the shoulder would also have the option of seeking an unscheduled award by showing actual or imputed wage loss attributable to that injury. D.C. Code § 32-1508 (3)(V). In light of these considerations, we do not perceive a clear public-policy rationale that would necessitate treating the shoulder as part of the arm.

Two other considerations bear on the CRB's conclusion that the shoulder should be considered part of the arm. First, dictionary definitions of "arm" often refer somewhat ambiguously to the upper limb of the human body, but when they are anatomically specific they often exclude the shoulder. *See, e.g.*, *Webster's Third New International Dictionary, Unabridged* 118 (2002) (defining "arm" as "(1) a human upper limb; (2) the part of an arm between the shoulder and the wrist");

*American Heritage Dictionary of the English Language* 100 (3d ed. 1992) ("An upper limb of the human body, connecting the hand and wrist to the shoulder."). *Cf. generally, e.g.*, *O'Rourke v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 46 A.3d 378, 383 (D.C. 2012) ("The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning.") (internal quotation marks omitted).

Second, the substantial weight of authority appears to support treating the shoulder as distinct from the arm for the purpose of determining a schedule award of workers' compensation benefits. *See, e.g.*, *Keenan v. Dir. for Benefits Review Bd.*, 392 F.3d 1041, 1045 (9th Cir. 2004) (shoulder is not part of arm); *Taylor v. Goodyear Tire & Rubber Co.*, 37 So. 3d 813, 820 (Ala. Civ. App. 2009) ("the shoulder is not part of the arm") (internal quotation marks omitted); *Safeway Stores, Inc. v. Indus. Comm'n*, 558 P.2d 971, 974 (Ariz. Ct. App. 1976) ("the shoulder is a distinct anatomical entity, not part of the arm") (citing cases); *Safford v. Owens Brockway*, 816 A.2d 556, 561 (Conn. 2003) (shoulders are "an unscheduled body part"); *Jewell v. Wood*, 130 So. 2d 277, 278 (Fla. 1961) (injury to shoulder is not injury to arm); *Gentry v. Ga. Cas. & Sur. Co.*, 131 S.E.2d 788, 790 (Ga. Ct. App. 1963) ("The shoulder, as we construe the law, is not a part of the arm."); *Will Cty. Forest Preserve Dist. v. Ill. Workers' Comp. Comm'n*, 970 N.E.2d 16, 24 (Ill. App.

Ct. 2012) ("the shoulder is not part of the arm") (citing cases); *Second Injury Fund v. Nelson*, 544 N.W.2d 258, 269-70 (Iowa 1995) (injury to shoulder is not schedule injury); *Getson v. WM Bancorp*, 694 A.2d 961, 964-69 (Md. 1997) ("shoulder injuries are unscheduled") (citing cases); *Foster v. State Accident Ins. Fund*, 485 P.2d 407, 408-09 (Or. 1971) (treating shoulder as unscheduled body part); *Cont'l Ins. Cos. v. Pruitt*, 541 S.W.2d 594, 595-96 (Tenn. 1976) (shoulder is not part of arm). We note that workers' compensation law in some of the cited jurisdictions differs in important respects from the law in this jurisdiction. By citing the foregoing cases for the specific principle at issue in this case, we do not mean to imply endorsement of the holdings of those cases on other issues.

We are aware of three jurisdictions that treat the shoulder as a schedule body part, but in each of those jurisdictions the statutory schedule specifically refers to the shoulder. *Strauch v. PSL Swedish Healthcare Sys.*, 917 P.2d 366, 367 (Colo. App. 1996) ("loss of an arm at the shoulder"); *Mitchell v. Petsmart, Inc.*, 239 P.3d 51, 60 (Kan. 2010) ("loss of an arm, including the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures"); *Hagen v. Labor & Indus. Review Comm'n*, 563 N.W.2d 454, 457 (Wis. 1997) ("loss of an arm at the shoulder").

For the foregoing reasons, we are not persuaded that the CRB has articulated a reasonable basis for treating the shoulder as part of the arm when determining a schedule award. To the contrary, we conclude that the CRB's decision to treat the shoulder as part of the arm was unreasonable as a matter of law. *Cf. generally, e.g.*, *District of Columbia Office of Human Rights v. District of Columbia Dep't of Corr.*, 40 A.3d 917, 923 (D.C. 2012) (concluding that agency interpretation of statute was unreasonable as matter of law). We therefore vacate the order of the CRB and remand for further proceedings focused on the degree to which Mr. Lyles has lost the use of his arm, not including the shoulder. We reiterate, however, that Mr. Lyles is not foreclosed from relying on impairments of his shoulder that have as their consequence partial or total loss of the use of his arm.

## C.

HUH finally argues that the CRB erred by concluding that, in calculating the amount of the award, the ALJ adequately explained the connection between Mr. Lyles's physical impairments and the extent of Mr. Lyles's disability. We agree.

Here too some background is necessary. If a claimant suffers total loss of a schedule body part, or total loss of use of a body part, the WCA provides a set

amount of compensation, generally 66⅔% of the claimant's average weekly wages for a specified duration that varies depending on the body part at issue. D.C. Code § 32-1508 (3)(A)-(R). A claimant seeking such an award is not required to introduce any evidence about the actual or likely effect of the loss on the claimant's wages or employment prospects. *E.g.*, *Smith v. District of Columbia Dep't of Emp't Servs.*, 548 A.2d 95, 101 (D.C. 1988). As we explained in *Smith*,

> The typical schedule, limited to obvious and easily-provable losses of [schedule body parts], was justified on two grounds: the gravity of the impairment supported a conclusive presumption that actual wage loss would sooner or later result; and the conspicuousness of the loss guaranteed that awards could be made with no controversy whatsoever. Although impaired earning capacity need not be proved to receive schedule benefits, this is not to be interpreted as an erratic deviation from the underlying principle of compensation law—that benefits relate to loss of earning capacity and not to physical injury as such. The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one, instead of a specifically proved one based on the individual's actual wage-loss experience.

*Id.* (ellipsis, citation, brackets, and internal quotation marks omitted).

A claimant may also seek a schedule award based on partial loss of use of a schedule body part. D.C. Code § 32-1508 (3)(S). As previously noted, the WCA generally provides that six factors may be considered in determining disability for purposes of schedule awards: the AMA Guides, pain, weakness, atrophy, loss of

endurance, and loss of function. D.C. Code § 32-1508 (U-i). Those factors thus are relevant to determining the degree of partial loss of use. Our cases indicate, however, that the amount of a partial-loss schedule award is not properly determined based solely on a non-economic medical determination as to the degree of physical impairment of the body part at issue. *Negussie v. District of Columbia Dep't of Emp't Servs.*, 915 A.2d 391, 399 (D.C. 2007) ("'[D]isability' is an economic and legal concept which should not be confounded with a medical condition . . . ."). Rather, in the context of partial-loss schedule awards, we have stated that "compensation under the [WCA] is predicated upon the loss of wage earning capacity, or economic impairment, and not upon functional disability or physical impairment." *Dent v. District of Columbia Dep't of Emp't Servs.*, 158 A.3d 886, 901 (D.C. 2017) (internal quotation marks omitted). We also have said that the six statutory factors "may be considered by the ALJ and the CRB in making a schedule award for permanent partial disability to compensate for loss of wage-earning capacity." *Id.* at 902; *see also id.* at 903 ("The ALJ's ability to come to a considered judgment of the extent of permanent partial disability is particularly important in the context of a schedule award. Because a schedule award is a one-time payment meant to compensate for the loss of future wage-earning capacity resulting from a work injury, it necessarily involves an element of prediction. Determining the extent of disability thus requires a highly fact-bound inquiry that takes into account the

particulars of the individual claimant, such as employment skills, experience, age, education, and reasonable prospects; evidence of post-injury wages, compared with pre-injury wages, may be more or less probative of loss of future wage-earning capacity depending on the facts of the case. It is for the ALJ to consider and weigh the relevant evidence presented in a given case.") (citation and internal quotation marks omitted).

As previously noted, Dr. Menet concluded that Mr. Lyles had a 47% permanent impairment to his right upper extremity, based on the following specific impairments: 3% based on lack of full motion, 12% for pain, 10% for weakness, 12% for loss of function, and 10% for loss of endurance. Dr. Menet did not tie those calculations to predictions about Mr. Lyle's future wage-earning capacity. The ALJ accepted Dr. Menet's calculations, with one exception: the ALJ did not accept the 10% impairment based on loss of endurance, because Mr. Lyles had returned to full-time work as a radiological technician/medical assistant. The ALJ therefore concluded that Mr. Lyles had suffered a 37% permanent disability to his right upper extremity. The ALJ did not explain how Dr. Menet's other calculations related to Mr. Lyles's future wage-earning capacity.

The CRB acknowledged that ALJs must specifically explain the nexus between the statutory factors of pain, weakness, atrophy, loss of endurance, and loss of function and a claimant's "industrial capacity." (The CRB has equated "industrial capacity" and "wage-earning capacity." *Dent*, 158 A.3d at 898 (internal quotation marks omitted).) The CRB concluded, however, that the ALJ had adequately explained his conclusions. We do not agree. The ALJ did not explain the likely consequences, if any, that Mr. Lyles's physical impairments would have for Mr. Lyles's wage-earning capacity. We therefore must remand for the ALJ to provide the necessary explanation. *See generally, e.g.*, *Bowles v. District of Columbia Dep't of Emp't Servs.*, 121 A.3d 1264, 1269 (D.C. 2015) ("When the ALJ fails to explain its reasoning in arriving at a disability award[,] such that we are unable to meaningfully review the decision to determine whether it is based on substantial evidence, we must remand the case back to the CRB.") (brackets and internal quotation marks omitted).

For the foregoing reasons, we vacate the order of the CRB and remand the case for further proceedings.

*So ordered.*