*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 22-AA-0957 & 23-AA-0001

CONNIE ALSTON, PETITIONER,

v.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, INTERVENOR.

On Petitions for Review of a Decision and Order of the
District of Columbia Department of Employment Services
Compensation Review Board
(2022-CRB-000047)

(Submitted October 27, 2023                          Decided May 2, 2024)

*David M. Snyder* was on the brief for petitioner.

*Brian L. Schwalb*, Attorney General for the District of Columbia, with whom *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General, filed a statement in lieu of a brief, for respondent.

*Samuel B. Scott* filed a brief for intervenor.

Before MCLEESE, DEAHL, and HOWARD, *Associate Judges*.

HOWARD, *Associate Judge*: Petitioner Connie Alston, a train operator for the Washington Metropolitan Area Transportation Authority ("WMATA"), injured her right arm and shoulder at work in March 2018. She sought benefits for a permanent partial disability. In her Compensation Order ("CO"), the Administrative Law Judge ("ALJ") rejected a finding by Ms. Alston's treating physician of a 35% impairment and adopted an award recommended by WMATA's independent medical examiner of a 5% impairment. The Compensation Review Board ("CRB") affirmed the CO, and Ms. Alston petitioned for review.

We conclude that the CRB acted outside the scope of its discretion when it affirmed the ALJ's conclusion that the treating physician's ratings were "inconsistent with . . . Ms. Alston's testimony." But substantial evidence supported the CRB's conclusions about the history of Ms. Alston's injuries and Ms. Alston's current role with WMATA. We reverse the CRB's decision in part and affirm in part, and remand for further proceedings.

## I.     Background

In March 2018, Ms. Alston injured her right arm and shoulder while at work. She underwent treatment. Ms. Alston and WMATA then disputed Ms. Alston's entitlement to permanent partial disability benefits, and an ALJ concluded that

Ms. Alston was entitled to an award of 5% impairment. Ms. Alston appealed the CO to the CRB, which affirmed the CO.

### A.    Ms. Alston's Injury and Treatment

On March 29, 2018, Ms. Alston was inspecting a WMATA train. She climbed onto the back of the train to unlock the door and her foot slipped off a platform. Ms. Alston used her right hand to attempt to grab the train handle and door. As a result, she suffered cervical injuries to her spine and neck. This made it difficult for Ms. Alston to return to work since her duties as a train operator involve "using her hand to move a control stick back and forth to operate the train." Ms. Alston underwent treatment for her injuries from April 2018 to June 2021, seeing orthopedist Dr. Joel Fechter and neurosurgeon Dr. Matthew Ammerman.[1]

After nearly three years of treatment, Dr. Fechter opined on June 9, 2021, that Ms. Alston had reached maximum medical improvement ("MMI"). Using figures 16-40, 16-43, and 16-46 of the Fifth Edition of the American Medical Association

---

[1] The CRB included facts about these visits from April 2018 to June 2021 in its December 7, 2022, Decision and Order. When it re-issued its Decision and Order on December 8, 2022, to "correct non-substantive errors," these facts were removed.

Guides to the Evaluation of Permanent Impairment ("AMA Guides"), Dr. Fechter

opined that Ms. Alston was entitled to:

> [N]ine percent (9%) impairment of the right upper extremity, an additional thirteen percent (13%) impairment for pain and weakness, and taking into account the additional subjective factors of loss of endurance and loss of function, an additional thirteen percent (13%) impairment rating for a total impairment rating of thirty-five percent (35%) to the right upper extremity.

About three months later, on September 29, 2021, orthopedist Dr. David Johnson examined Ms. Alston upon WMATA's request for an Independent Medical Evaluation. At that point, Dr. Johnson had evaluated Ms. Alston twice: once in May 2018 and again in January 2019. Like Dr. Fechter, Dr. Johnson concluded that Ms. Alston had reached MMI. Dr. Johnson diagnosed Ms. Alston, in connection with her 2018 injury, with symptomatic exacerbation of multilevel degenerative disk disease of the cervical spine with spinal stenosis, impingement syndrome, and tendinosis of the subscapularis in the right shoulder and biceps tendon. These injuries were "superimposed" on Ms. Alston's "preexisting injury to the [acromioclavicular ("AC")] joint," for which Ms. Alston had undergone surgery in 2008 and which was "currently objectively and symptomatically resolved."

Using the Sixth Edition of the AMA Guides, Dr. Johnson then opined that

> Ms. Alston warranted a zero percent (0%) impairment rating for her right upper extremity and no significant objective abnormal findings at MMI. . . . Ms. Alston would qualify for a ten percent (10%) upper extremity impairment rating according to Table 15-5 [of the AMA Guides], due to a preexisting procedure that was performed in 2008 but that procedure had no relationship to the present injury of March 29, 2018.

Ms. Alston and WMATA disputed Ms. Alston's entitlement to permanent partial disability benefits based on the nature and extent of her right arm disability.

### B.     The ALJ Hearing and Compensation Order

To resolve the dispute, a hearing was held before an ALJ. The ALJ admitted into evidence Dr. Fechter's reports from April 18, 2018, through April 24, 2020, and impairment evaluation from June 9, 2021; Dr. Ammerman's medical reports from August 13, 2018, through May 11, 2020, and operative report from November 12, 2019; a transcript from Dr. Fechter's deposition on May 19, 2022; Dr. Johnson's independent medical examinations from May 31, 2018, January 2, 2019, and September 29, 2021; Dr. Fechter's orthopedic discharge report from June 12, 2020; Ms. Alston's return-to-work wages; and selected pages of the Fifth and Sixth Editions of the AMA Guides. Ms. Alston was the only witness to testify.

Ms. Alston testified about how she had slipped off a platform leading to the door of the train she had been inspecting; how she had received treatment from

Dr. Fechter and undergone surgery performed by Dr. Ammerman; and how, despite the doctors releasing her to "light duty," there was "no light duty for train operators." Due to both her injury and her seniority, she was able to "come back to work" as a train operator in the yard, where she couples and uncouples trains for about ten minutes a day. This role, according to Ms. Alston, does not require her to "reinjur[e] that same shoulder" where she is still experiencing pain. She explained that if she had the same full-time role as before, she "would not have been able to come back to work." Ms. Alston described how she continued to experience pain in her right shoulder and arm area, where she had a prior surgery in 2008.

The ALJ found Ms. Alston's testimony credible and that Dr. Fechter was entitled to a treating physician preference. But the ALJ rejected Dr. Fechter's rating as "not persuasive" since his "impairment rating [wa]s inconsistent with the medical records and Claimant's testimony." The ALJ reasoned that Dr. Fechter's "initial impairment rating did not acknowledge Claimant's prior injury or that the work injury cause[d] an exacerbation of the prior injury." And Dr. Fechter did "not sufficiently explain the basis of his rating," used "vague and conclusory language in providing his rating," and did not "specify any graphs or tables in supporting his impairment rating."

In contrast, the ALJ found that Dr. Johnson's examination showed that Ms. Alston "had no pain with movement of the right shoulder and no pain with movement of the neck and there was no sensory deficit or motor weakness to either upper extremity." As the ALJ summarized, "Dr. Johnson acknowledged Claimant's prior injuries and opined that Claimant's March 29, 2018 work injury symptomatically exacerbated Claimant's multilevel degenerative disc disease." To the ALJ, Dr. Johnson distinguished between the 2018 injury's impact on Ms. Alston's cervical spine versus her right shoulder, and between the residual impact from the 2008 surgery and the exacerbation caused by the 2018 injury. The ALJ adopted what she characterized as Dr. Johnson's "well-reasoned" opinion. The ALJ concluded that Ms. Alston had failed to prove by a preponderance of the evidence that she was entitled to an award of 35% permanent partial disability benefits, and ordered WMATA to make payments based on a 5% award.

## C. The Compensation Review Board Decision

On appeal, the CRB affirmed the ALJ's order. The ALJ had "use[d] her discretion as the fact finder" to find Dr. Fechter's testimony "unclear" and his pain ratings unsupported by the record. Dr. Fechter's testimony, the CRB observed, was "largely based on subjective complaints from Ms. Alston and inconsistent with both the medical records and Ms. Alston's testimony offered at the formal hearing." The

CRB also noted that Ms. Alston "worked in a full duty capacity at a new job, where she performed her duties without modifications" for pain, weakness, loss of endurance, and loss of function that she suffered as a result of the 2018 injury. The CRB found that "substantial evidence supports the finding that the ratings offered by Dr. Fechter were not based upon a full assessment of Ms. Alston's relevant medical history and, therefore, were unpersuasive to the ALJ." Ms. Alston argued to the CRB that the ALJ incorrectly determined that deposition was an "inappropriate place for Dr. Fechter to elaborate on an uncontested issue," but the CRB determined that the ALJ made no error when she decided to weigh conflicting testimony in the manner that she did.

This petition for review followed.[2]

## II.    Standard of Review

"We review a decision of the CRB to determine whether the decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Howard Univ. Hosp. v. D.C. Dep't of Emp. Servs.*, 200 A.3d 1244, 1248

---

[2] Ms. Alston petitioned for review of the December 7, 2022, Decision and Order at No. 22-AA-0957 and the December 8, 2022, re-issued Decision and Order at No. 23-AA-0001. This court sua sponte consolidated these petitions on January 9, 2023.

(D.C. 2019) (quoting *Reyes v. D.C. Dep't of Emp. Servs.*, 48 A.3d 159, 164 (D.C. 2012)). "We will affirm the CRB's decision if (1) the agency made findings of fact on each contested material factual issue, (2) substantial evidence supports each finding, and (3) the agency's conclusions of law flow rationally from its findings of fact." *Reyes*, 48 A.3d at 164 (citations omitted). "Substantial evidence" consists of evidence that "a reasonable mind might accept as adequate to support a conclusion." *D.C. Pub. Schs. v. D.C. Dep't of Emp. Servs.*, 262 A.3d 213, 219 (D.C. 2021) (quoting *Marriott Int'l v. D.C. Dep't of Emp. Servs.*, 834 A.2d 882, 885 (D.C. 2003)).

When we review a decision of the CRB, we "cannot ignore" the ALJ's CO. *Georgetown Univ. Hosp. v. D.C. Dep't of Emp. Servs.*, 916 A.2d 149, 151 (D.C. 2007). We may not review the factual findings de novo and "substitute our view of the facts for that of the ALJ," but we "will not defer" to the ALJ's factual findings if they are not supported by substantial evidence. *Reyes*, 48 A.3d at 164 (citations omitted). "Although our review of agency decisions is deferential, it is by no means toothless. Our principal function in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues." *Georgetown Univ. Hosp.*, 916 A.2d at 151 (citations omitted). "The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision." *Id.* (citations omitted).

### III.    Discussion

We conclude that the CRB acted beyond its discretion in its rejection of Dr. Fechter's ratings without sufficient explanation, but that substantial evidence supports the CRB's conclusions about the history of Ms. Alston's injuries and characterization of Ms. Alston's current role.

### A.    Consistency of Dr. Fechter's Ratings with Ms. Alston's Testimony

When the ALJ concluded that Dr. Fechter's ratings were "inconsistent with . . . [Ms. Alston's] testimony," the ALJ needed to more specifically explain why.

When concluding that evidence lacks clarity, a fact-finder must explain why with sufficient specificity to allow for review. *See Georgetown Univ. Hosp.*, 916 A.2d at 151; *see also Clark v. D.C. Dep't of Emp. Servs.*, 772 A.2d 198, 204 (D.C. 2001) (remanding where hearing examiner and Director of the Department of Employment Services failed to "properly conside[r]" treating physician's testimony that wearing headset aggravated claimant's condition); *Jones v. D.C. Dep't of Emp. Servs.*, 41 A.3d 1219, 1226 (D.C. 2012) (remanding where "[h]ow the ALJ determined that the disability award should be 7%—and not, for example, 1%, 10% or 30%—[wa]s a complete mystery"); *Bowles v. D.C. Dep't of Emp. Servs.*, 121

A.3d 1264, 1269-70 (D.C. 2015) (remanding where ALJ had considered the amount of physical impairment caused by a surgical procedure and claimant's potential future earnings, pain, and atrophy and had concluded that claimant was entitled to 10% permanent partial disability, but this court could not determine which values the ALJ assigned to each factor).

Here, the ALJ did not explain why Dr. Fechter's ratings were "inconsistent with . . . [Ms. Alston's] testimony." In his deposition, Dr. Fechter shared how Ms. Alston told him that

> she had more pain in the neck and into the right shoulder with lifting, overhead work if she had to do any pushing, pulling, bending, had some popping and clicking, had stiffness and weakness in the neck and right shoulder. She had more pain and achiness, aching discomfort with cold or damp weather changes in the neck and in the shoulder, and also some occasional numbness and tingling to the fingers of the right hand also.

Dr. Fechter accordingly determined percentages for pain, weakness, loss of function, and loss of endurance "from [his] conversation with her." In her hearing before the ALJ, Ms. Alston described how she continued to experience pain in her right shoulder and arm area. The ALJ, in what appears to be a summary of Ms. Alston's testimony, discussed how Ms. Alston "still experiences pain but it is not as intense," "has difficulty turning her neck to the right side," and has difficulty "reaching

overhead," "carrying heavy things," and "reaching around the back area." In turn, the ALJ explained why she did not find Dr. Fechter's rating persuasive: Dr. Fechter "based his impairment rating on the information [Ms. Alston] provided to him," "admitted that he arrived at the impairment percentages based on his conversations with [Ms. Alston]," and "first mentioned" at his deposition that Ms. Alston's "stenosis and degenerative changes were aggravated by the work injury." But the ALJ did not give an example of a gap between Ms. Alston's testimony and Dr. Fechter's rating, or otherwise explain why the rating was "inconsistent" with Ms. Alston's testimony.

The ALJ discussed Ms. Alston's testimony in the context of describing that testimony as "more aligned with Dr. Johnson's permanent impairment rating." But it is even more difficult to determine from the ALJ's discussion of Dr. Johnson's rating how Ms. Alston's testimony was more aligned with Dr. Johnson's rating than with Dr. Fechter's rating. The ALJ wrote:

> When evaluating the competing medical opinions and considering Claimant's testimony that she experiences pain, Dr. Johnson's examination of Claimant which was after Dr. Fechter's, revealed that she had no pain with movement of the right shoulder and no pain with movement of the neck and there was no sensory deficit or motor weakness to either upper extremity.

This statement does not clarify which parts of Ms. Alston's testimony were consistent with Dr. Johnson's rating and inconsistent with Dr. Fechter's rating.

Without such clarification, we cannot determine to what extent the ALJ considered Ms. Alston's testimony—a requirement to sustain the CRB's finding that substantial evidence supported the ALJ's conclusion. *See Catlett v. D.C. Dep't of Emp. Servs.*, 257 A.3d 543, 550 (D.C. 2021) (finding ALJ erred where, "although the ALJ summarized petitioner's testimony . . . the ALJ appears not to have considered petitioner's testimony"). We therefore conclude that the CRB should have required the ALJ to discuss why Dr. Fechter's impairment ratings were "unclear."

### B.       History of Ms. Alston's Injuries

When it came to the impact of Ms. Alston's prior injury on her impairment rating, the CRB correctly concluded that "substantial evidence supports the finding that the ratings offered by Dr. Fechter were not based upon a full assessment of Ms. Alston's relevant medical history."[3] This is because, "in cases involving

---

[3] Ms. Alston also advances an argument about apportionment regarding her injuries. But we agree with the CRB that apportionment is a legal concept that is "irrelevant to this case" since this petition focuses on the clarity or ambiguity in Dr. Fechter's testimony.

disability arising in part from prior injury and in part from a subsequent injury, employers were made responsible [under the Workers' Compensation Act] 'as if the subsequent injury alone caused the subsequent amount of disability.'" *Howard Univ. Hosp.*, 200 A.3d at 1249 (quoting D.C. Code § 32-1508(6)(A)). This means that when determining an impairment, a physician should explicitly discuss the extent to which prior injuries contribute to an impairment rating. *Compare Jackson v. D.C. Dep't of Emp. Servs.*, 979 A.2d 43, 51 (D.C. 2009) (reversing a CRB decision where an independent medical examiner mistakenly reported that petitioner had been scheduled for a knee surgery prior to an on-the-job fall, whereas treating physician noted that petitioner rescheduled surgery in light of the fall), *with Hensley v. D.C. Dep't of Emp. Servs.*, 49 A.3d 1195, 1200 (D.C. 2012) (upholding an independent medical examiner's assessment where an examiner concluded—and the treating physician conceded—petitioner's medical condition resulted from natural progression of prior condition and not from a work-related injury). As the ALJ pointed out, however, Dr. Fechter "did not acknowledge" Ms. Alston's 2008 injury "or that the work injury cause[d] an exacerbation of the prior injury." The ALJ here correctly pointed out Dr. Fechter's failure to do so.

Dr. Johnson, however, incorporated such a discussion in his ratings. First, he explained that Ms. Alston would have qualified for a 10% impairment rating for her right shoulder, but that "10% would be apportioned to preexisting causes" since the

impairment had "no relationship to the present injury of 03/29/2018." Second, out of the 5% impairment rating from the "preexisting multilevel degenerative disc disease that was symptomatically exacerbated," Dr. Johnson identified that at least 3% was due to "causes that preexisted" the 2018 injury.

It is true that Dr. Fechter noted that Ms. Alston's "right shoulder dislocation at work in 2008" made Ms. Alston's pain "much worse since the work injury of 3-29-18," and testified similarly at his deposition. The ALJ, however, concluded within her discretion that Dr. Johnson's discussion provided substantial evidence for the permanent partial disability determination; the CRB accordingly affirmed that determination. Unlike the lack of discussion on the rationale Dr. Fechter shared for his ratings, here the ALJ supported her determination of Dr. Fechter's treatment when the ALJ "explicitly addressed the treating physician's testimony and explained why it [wa]s rejected." *Jackson*, 979 A.2d at 49.

Because the prior injury never comprised part of Dr. Fechter's impairment rating, we conclude that substantial evidence supports the CRB's reasoning specifically with respect to Ms. Alston's 2008 shoulder injury.

### C.    Characterization of Ms. Alston's Current Role

To minimize "repetitive motion" in her shoulder, Ms. Alston went from operating trains for commuters eight hours a day to coupling and uncoupling trains for about ten minutes a day in a WMATA maintenance yard.  The CRB adopted the ALJ's observation that Ms. Alston "worked in a full duty capacity at a new job, where she performed her duties without modifications" related to the factors Dr. Fechter cited in his impairment rating.  Our case law prevents us from adopting Ms. Alston's argument that the CRB—and the underlying CO—erred in doing so.

Although Ms. Alston may have returned to a "lighter duty position" after her injury, the lack of a corresponding wage loss supported the ALJ's and CRB's conclusions.   This is because, under the District of Columbia Workers' Compensation Act, disability has been defined in "economic terms" as "incapacity because of injury which results in the loss of wages."  *Dent v. D.C. Dep't of Emp. Servs.*, 158 A.3d 886, 901 (D.C. 2017), *as amended* (May 25, 2017) (interpreting D.C. Code § 32-1501(8)) (citation omitted).

While wage loss is not the sole determinant of a schedule award under the Workers' Compensation Act, an ALJ's weighing of relevant evidence includes "evidence of post-injury wages, compared with pre-injury wages . . . ."  *Id.* at 903 (citing *Jones*, 41 A.3d at 1224).  Here, the ALJ correctly considered such evidence

when her conclusions were informed by the fact that Ms. Alston had "returned to work, full duty and at her full wages, albeit in a different position that requires her to operate trains for approximately 10 minutes each day." To be sure, when the CRB observed Ms. Alston was "perfom[ing] her duties without modifications," the CRB's reasoning could have more specifically focused on the lack of wage loss. But, in light of the ALJ's findings, the CRB did not err when it concluded that Ms. Alston was "work[ing] in a full duty capacity at a new job."

## IV. Conclusion

ALJs are an important part of our system for resolving the disputes of parties. They are entrusted with hearing cases without a jury and operating without the same evidentiary rules as courts of general jurisdiction. This comes with several important obligations, including: (1) weighing the evidence; (2) making findings on every contested material fact; (3) making conclusions of law that rationally flow from those facts; and (4), where necessary to making findings of fact and conclusions of law, completing the administrative record. *See Wood v. Dep't of Consumer & Regul. Affs.*, 293 A.3d 163, 167 (D.C. 2023) ("We review OAH decisions to determine whether (1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact.") (citation omitted); *Honemond v. D.C. Dep't of*

*Emp. Servs.*, 295 A.3d 1197, 1209 (D.C. 2023) ("An ALJ is required by statute to consider all the evidence and to exercise independent judgment in determining whether the claimant has a permanent disability and, if so, the extent of that disability.") (citation omitted).

This is a significant responsibility. An ALJ is entrusted to carry out that responsibility in a manner that is not "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C. Code § 2-510(a)(3)(A). Consequently, an administrative tribunal must engage with the evidence across the record. In other words, an ALJ's job is to get to the bottom of the issue.

In the discrete way identified above, we are not confident that occurred here. We reverse in part and affirm in part the judgment of the Compensation Review Board, and remand for further proceedings consistent with this opinion.

*So ordered.*